479 S.E.2d 649

Scott **HUTCHISON**, Plaintiff Below, Appellee,

v.

The **CITY OF HUNTINGTON**, Defendant Below, Appellant.

No. 23332.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 17, 1996.

Decided Nov. 15, 1996.

James W. St. Clair, St. Clair and Levine, Huntington, for Appellee.

Jendonnae L. Houdyschell, Assistant City Attorney, Huntington, for Appellant.

CLECKLEY, Justice:

This is an appeal [1] by the defendant below, the City of Huntington, from a jury verdict awarding damages to the plaintiff below, Scott Hutchison. The plaintiff filed suit alleging the defendant delayed giving him a requested building permit in violation of state and federal law. The defendant assigns as error (1) the trial court's denial of its motion to dismiss the state claim, (2) admitting evidence at trial of a prior property dispute between the parties, and (3) that the evidence was insufficient to support the verdict.

## I.

## FACTUAL AND PROCEDURAL HISTORY

The record in this case indicates that at some point in late 1991, the plaintiff approached Richard Dixon, Planning Supervisor for the defendant, and inquired as to whether a parcel of property located on Bradley and Waverly Roads in the Westmoreland section of Huntington was zoned for business. The plaintiff was contemplating purchasing the property and building either a car wash or mini-storage units on the site. In a letter dated February 3, 1992, Dixon wrote to the plaintiff that "[t]he development of a car wash on the [site] is a permissible use if it meets all other restrictions of the Zoning Ordinance." Dixon's letter stated further that "[t]he placement of storage units is also acceptable." In reliance upon Dixon's representations that the cite was zoned for business, the plaintiff borrowed $55,000 from a local bank and purchased the property in question on September 9, 1992. The plaintiff had decided to build mini-storage units on the property.

Once the plaintiff purchased the property, he applied for a building permit from Dixon at some point in the second week of October, 1992. On October 6, 1992, Dixon wrote a memo to the mayor of Huntington, wherein he stated that the Planning Commission wanted the mayor to place a thirty-day moratorium on construction on the property purchased by the plaintiff while an investigation was made into complaints by residents adjacent to the area. The complaints involved possible illegal zoning of the site, PCB contamination, and drainage and sewer problems. In a letter written by the mayor of Huntington, to Dixon, on October 6, 1992, the mayor stated that he had "requested that Public Works and Zoning issue no permits of any kind to Scott Hutchinson or any others who might seek them for construction on the [site]." The mayor based his decision to deny the plaintiff a building permit on the mayor's need to learn (1) if the site was illegally zoned for business in 1961, (2) whether drainage and sewer problems existed with the site for business zoning purposes, and (3) whether "possible PCB contamination and other general factors" might affect the site as a business area. Dixon wrote to the mayor again on October 7, 1992, and indicated that: "There is no record that this parcel was ever zoned residential. The accusation that it was rezoned from [residential to busi-

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996 and continuing until further order of this Court.

ness] illegally at some point is simply unfounded." With respect to the PCB issue, Dixon wrote the mayor: "We have also contacted Scott McPhilliamy at the EPA office in Wheeling concerning possible PCB contamination of the site. He stated that there was no substantial proof that the site was contaminated and that the EPA would not begin an investigation. He felt that the residents were 'grasping for straws' in order to stop the development of the property.?" Shortly after this communication between the mayor and Dixon, the plaintiff went to see Dixon about getting a building permit. Dixon told the plaintiff to prepare a site plan and return it to Dixon's office. The plaintiff complied with this requirement, and provided Dixon a site plan the day after it was requested. However, without explanation, Dixon refused to give the plaintiff the building permit. The plaintiff eventually learned that residents in the area had objected to his plan for building mini-storage units, and that the mayor had ordered that he was not to be issued a building permit.

The area residents eventually went to the Planning Commission with a request that plaintiff's property be rezoned to residential. The plaintiff appeared at Planning Commission meetings in October and December, in an effort to prevent his property from being rezoned to residential. The Planning Commission eventually forwarded the issue to the City Council with a recommendation that the City Council try "to prevent the construction on the [site]." On December 14, 1992, the City Council held its first reading of an ordinance to amend the zoning laws for the purpose of rezoning plaintiff's property from business to residential.[3] On December 28, 1992, the City Council held its second reading on the proposed ordinance amendment. However, after counsel for plaintiff informed the City Council that it would have to pay plaintiff the fair market value of his property, should it be rezoned, the City Council tabled its vote on the issue. On January 11, 1993, the City Council met again to consider rezoning the plaintiff's property. At this meeting, one of the City Council members indicated that someone was interested in buying plaintiff's property. It was pointed out by plaintiff's counsel that the plaintiff never expressed a desire to sell his property.

**2.** It was also reported by the defendant's Traffic Engineer and City Engineer that the proposed mini-storage units would not cause a flooding problem in the area, nor would it pose a traffic congestion problem.

**3.** The following excerpts from the synopsis of the City Council's meeting of December 7, was introduced into evidence:

"Mr. Richard Dixon: The Planning Commission felt this issue to be of such significance that City Council should evaluate the situation and take whatever action deemed appropriate in order to preserve the intent of the city's zoning ordinance and to prohibit construction of the mini-storage units on this location.... [He] explained a potential buyer would like to develop a coffee-house/bookstore in this location."

"Councilman Taylor: [I]f the man who purchased the property were allowed to construct the mini warehouses the neighborhood would be ruined. He felt it would create a coal mine appearance for those entering the City of Huntington."

"Councilman Johnson: [He] maintained the present owner had followed the proper procedure, had been advised by the city the property was zoned for business and did not take any steps to construct the mini-warehouses until he had crossed all his t's and dotted all his i's. Continuing, he stated that if the city were to rezone and change the rules in the middle of the game then the city, he felt, had an obligation to the owner and would have to compensate him for the appraised value of the property[.]"

"Councilman Zink: [He] reiterated the recommendation of the Planning Commission.... Mr. Zink said it was tough to play a game if the rules were changed in the middle of that game. He said he had not reached a conclusion as yet and hoped there would be public debate at the next Council meeting."

"Councilman Evans: [A]greed with Councilman Zink that if indeed the property had already been zoned for general business then it was totally wrong for the rules to be changed in midstream."

"Councilperson Barret: [S]aid she was opposed to this ordinance for the reasons just stated; in addition, she felt the city would be opening itself to a suit as well as setting a precedent for anyone who decided they didn't like a particular piece of property zoned a certain way. With this ordinance in place, they could change it."

"Councilman Grubb: [S]aid the one solution for the residents would be to buy the property or the city could buy the property, with taxpayers' money. Otherwise, there was no other legal recourse simply because the man did follow the proper procedures."

The City Council eventually voted on the issue of rezoning, but the measure was defeated. On January 13, 1993, the plaintiff was issued a building permit by the defendant.

On April 12, 1994, the plaintiff filed the instant suit against the defendant.[4] The plaintiff brought this action to recover the additional cost he incurred in having to build his mini-storage units during the winter of 1993, rather than during the spring of 1992, as a result of the initial refusal by the defendant to issue him a building permit. At the trial, the plaintiff presented evidence that the delay caused him to spend an additional $24,591. The plaintiff alleged both state and federal causes of action against the defendant.[5] The defendant answered the complaint, and filed a motion to dismiss the complaint under a theory of immunity.[6] The trial court denied the motion to dismiss. The case proceeded to trial by jury on July 18, 1995. Only three witnesses were called at the trial.[7] During the trial, the plaintiff presented testimony, over the defendant's timely objection, of additional conduct by the defendant in delaying his right to build mini-storage units on another piece of property. At the close of the trial, the jury returned with a verdict in favor of the plaintiff, awarding him $25,000 in damages. The defendant now prosecutes this appeal alleging that the trial court committed error in (1) denying its motion to dismiss the state law claim, (2) admitting evidence at trial of a prior property dispute between the parties, and (3) failing to find that the evidence was insufficient to support the verdict.

4. The mayor was also named as a defendant in this matter. However, the record indicates the plaintiff eventually withdrew his complaint against the mayor.

5. Under the state cause of action, the plaintiff's theory was that the delay in issuing him a building permit amounted to a taking of his property without due process of law, in violation of the state constitution. The federal cause of action was brought under 42 U.S.C. § 1983, as a denial of plaintiff's right not to be deprived of his property rights without due process of law under the federal constitution.

6. The defendant sought to establish immunity for its actions under "The Governmental Tort Claims and Insurance Reform Act" as codified at W. Va.Code, 29–12A–1, *et seq.*

## II.

### DISCUSSION

 In this appeal, the City of Huntington claimed that the plaintiff's complaint failed to state a sufficient allegation to establish any violations of the law that would entitle him to relief. Ordinarily, this Court does not entertain nor discuss a denial of a motion for failure to state a claim under W.Va.R.Civ.P. 12(b)(6), in that such an order is interlocutory in nature. Because part of the action is grounded in federal law, *i.e.,* Title 42, § 1983, and state statutory immunities laws, we believe some early observations are in order.[8] We premise the remarks that follow with the concern that the need for early resolution in cases ripe for summary disposition is particularly acute when the defense is in the nature of an immunity. The United States Supreme Court has held that orders denying substantial claims of qualified immunity should be decided before trial, and these pretrial decisions are immediately appealable under the collateral order doctrine. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) ("the entitlement is an *immunity from suit* rather than a mere defense to liability; and like absolute immunity, it is effectively lost if the case is erroneously permitted to go to trial."). We agree with the United States Supreme Court to the extent it has encouraged, if not mandated, that claims of immunities, where ripe for disposition, should be summarily decided before trial.[9] Public offi-

7. During the plaintiff's case-in-chief, the plaintiff testified, and also called as a witness, his wife (she kept the plaintiff's business records) and Dixon. The defendant called Dixon as its only witness.

8. This case has proceeded beyond the point of the pleading stage, and the issue of pleading sufficiency has been lost. Although our review must now focus on the entire trial and the evidence, we believe future guidance is warranted.

9. We do not address the issue of whether a denial of a motion to dismiss or summary judgment based on qualified immunity is an appealable order under our collateral order doctrine. *See Gooch v. W. Va. Dept. of Public Safety,* 195 W.Va. 357, 363 n. 7, 465 S.E.2d 628, 634 n. 7

cials and local government units should be entitled to qualified immunity from suit under § 1983, or statutory immunity under W. Va.Code, 29–12A–5(a), unless it is shown by specific allegations that the immunity does not apply. *See State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992).

■ Immunities under West Virginia law are more than a defense to a suit in that they grant governmental bodies and public officials the right not to be subject to the burden of trial at all. The very heart of the immunity defense is that it spares the defendant from having to go forward with an inquiry into the merits of the case. *See Swint v. Chambers County Commission*, 514 U.S. 35, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995) (The Court distinguished summary judgment rulings on claims by individuals to qualified immunity as immunities from suit). In this vein, unless expressly limited by statute, the sweep of these immunities is necessarily broad. They protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). The policy considerations driving such a rule are straightforward: public servants exercising their official discretion in the discharge of their duties cannot live in constant fear of lawsuits, with the concomitant costs to the public servant and society. *See Clark v. Dunn*, 195 W.Va. 272, 465 S.E.2d 374 (1995); *Goines v. James*, 189 W.Va. 634, 433 S.E.2d 572 (1993); *Bennett v. Coffman*, 178 W. Va. 500, 361 S.E.2d 465

(1987). Such fear will stymie the work of state government, and will "dampen the ardor of all but the most resolute, or the most irresponsible, [public officials] in the unflinching discharge of their duties." *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2nd Cir.1949)); *see also Parkulo v. West Virginia Board of Probation and Parole*, —— W. Va. ——, —— S.E.2d —— [1996 WL 663338] (No. 23366, 11/15/96) ("The public interest is that the official conduct of the officer is not to be impaired by constant concern about personal liability"). The doctrine of qualified and statutory immunity was created to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.[10]

■ Nevertheless, qualified immunity, as opposed to absolute statutory immunity, is not an impenetrable shield that requires toleration of all manner of constitutional and statutory violations by public officials. Indeed, the only realistic avenue for vindication of statutory and constitutional guarantees when public servants abuse their offices is an action for damages. *See* Alan K. Chen, *The Ultimate Standard: Qualified Immunity in the Age of Constitutional Balancing Tests*, 81 Iowa L.Rev. 261 (1995). In an effort to balance these competing concerns, this Court has devised an objective test for evaluating official conduct under our immunity statutes. Our cases suggest that whether qualified im-

(1995); *James M.B. v. Carolyn M.*, 193 W.Va. 289, 293 n. 4, 456 S.E.2d 16, 20 n. 4 (1995). Interlocutory appeals must remain the exception, not the rule. Even under federal law, appeals from a district court's order denying summary judgment on the basis of qualified immunity is immediately appealable only when the ruling presents a question of law. The United States Supreme Court clarified that orders are based on issues of law when they concern only application of established legal principles, such as whether a public official's conduct was objectively reasonable, in light of clearly established law, to a given (for purposes of appeal) set of facts. *Johnson v. Jones*, 515 U.S. 304, ——, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995). Orders that resolve a fact-related dispute of " 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial," however, are not immediately appealable and must await final judgment. *Id.*

10. We believe the initial joinder of the City of Huntington with its Mayor, in his personal capacity, as defendants gave rise to two separate immunities. First, the Mayor was entitled to invoke a "qualified immunity" shield to both the federal and state cause of action. As we discuss later in the main text of the opinion, because the suit against the City of Huntington centers around its authority to issue a building permit, absolute "statutory immunity" is implicated. We address "qualified immunity," as opposed to absolute statutory immunity, in detail because it is qualified immunity only that poses a substantial problem for early resolution. In absolute statutory immunity cases, the lower court has little discretion, and the case must be dismissed if one or more of the provisions imposing absolute immunity applies.

munity bars recovery in a civil action turns on the objective legal reasonableness of the action assessed, in light of the legal rules that were clearly established at the time it was taken. *See State v. Chase Securities, Inc., supra; Bennett v. Coffman,* 178 W. Va. 500, 361 S.E.2d 465 (1987). In the Syllabus of *Bennett,* this Court stated, in part:

"Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

■ *State v. Chase Securities, Inc.,* adds an additional element to our immunity jurisprudence: "There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive." *Id.* 188 W.Va. at 365, 424 S.E.2d at 600. Therefore, in the absence of any wilful or intentional wrongdoing, to establish whether public officials are entitled to qualified immunity, we ask whether an objectively reasonable official, situated similarly to the defendant, could have believed that his conduct did not violate the plaintiff's constitutional rights, in light of clearly established law and the information

possessed by the defendant at the time of the allegedly wrongful conduct? [11] When broken down, it can be said that we follow a two-part test: (1) does the alleged conduct set out a constitutional or statutory violation, and (2) were the constitutional standards clearly established at the time in question? [12]

■ Though it is the province of the jury to determine disputed predicate facts, the question of whether the constitutional or statutory right was clearly established is one of law for the court. In this connection, it is the jury, not the judge, who must decide the disputed "foundational" or "historical" facts that underlie the immunity determination, but it is solely the prerogative of the court to make the ultimate legal conclusion. What this means is that unless there is a dispute of facts, the ultimate question of qualified or statutory immunity is ripe for summary disposition.[13]

■ We believe that in civil actions where immunities are implicated, the trial court must insist on heightened pleading by the plaintiff. *See Schultea v. Wood,* 47 F.3d 1427 (5th Cir.1995) (*en banc*) (a § 1983 ac-

11. The threshold inquiry is, assuming that the plaintiff's assertions of facts are true, whether any allegedly violated right was clearly established. To prove that a clearly established right has been infringed upon, a plaintiff must do more than allege that an abstract right has been violated. Instead, the plaintiff must make a "particularized showing" that a "reasonable official would understand that what he is doing violated that right" or that "in the light of preexisting law the unlawfulness" of the action was "apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Indeed, some courts hold that an "official may not be charged with knowledge that his or her conduct was unlawful unless it has been previously identified as such." *Warner v. Graham,* 845 F.2d 179, 182 (8th Cir.1988). But, for a right to be clearly established, it is not necessary that the very actions in question previously have been held unlawful. *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039. To define the law in question too narrowly would be to allow defendants "to define away all potential claims." *Kelley v. Borg,* 60 F.3d 664, 667 (9th Cir.1995).

12. Of course, "a necessary concomitant to the determination of whether the constitutional [or statutory] right asserted by the plaintiff is 'clearly established' at the time the [public official] acted

is the determination of whether the plaintiff has asserted a violation of a constitutional [or statutory] right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1792, 114 L.Ed.2d 277 (1991). Moreover, the right the official is alleged to have violated must be specific in regard to the kind of action complained of for the constitutional or statutory right at issue to have been clearly established. When dealing with broad rights, the plaintiff bears the burden of particularizing such a right before those rights are subject to the qualified immunity test of being clearly established. Thus, where a plaintiff's complaint, even when accepted as true does not state a cognizable violation of constitutional or statutory rights, then the plaintiff's claim fails. If the complaint fails to allege a cognizable violation of constitutional or statutory rights it also has failed to state a claim upon which relief can be granted.

13. An assertion of qualified or absolute immunity should be heard and resolved prior to any trial because, if the claim of immunity is proper and valid, the very thing from which the defendant is immune—a trial—will absent a pretrial ruling occur and cannot be remedied by a later appeal. On the other hand, the trial judge must understand that a grant of summary judgment based on immunity does not lead to loss of right that cannot be corrected on appeal.

tion); *see generally Parkulo v. West Virginia Board of Probation and Parole, supra.* To be sure, we recognize the label "heightened pleading" for special pleading purposes for constitutional or statutory torts involving improper motive has always been a misnomer. A plaintiff is not required to anticipate the defense of immunity in his complaint, *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980), and, under the West Virginia Rules of Civil Procedure, the plaintiff is required to file a reply to a defendant's answer only if the circuit court exercises its authority under Rule 7(a) to order one. We believe, in cases of qualified or statutory immunity, court ordered replies and motions for a more definite statement under Rule 12(e) can speed the judicial process. Therefore, the trial court should first demand that a plaintiff file a "a short and plain statement of his complaint, a complaint that rests on more than conclusion alone." *Schultea v. Wood,* 47 F.3d at 1433. Next, the court may, on its own discretion, insist that the plaintiff file a reply tailored to an answer pleading the defense of statutory or qualified immunity. The court's discretion not to order such a reply ought to be narrow; where the defendant demonstrates that greater detail might assist an early resolution of the dispute, the order to reply should be made. Of course, if the individual circumstances of the case indicate that the plaintiff has pleaded his or her best case, there is no need to order more detailed pleadings. If the information contained in the pleadings is sufficient to justify the case proceeding further, the early motion to dismiss should be denied.

We now address the merits of the case. Because of our disposition of this appeal, we believe that the issues can be limited to two assignments of error that we discuss in turn.

### A.

### Cause of Action under State Law

■ The first contention of the City of Huntington is that the plaintiff failed to prove a claim under the Due Process Clause embodied within Article 3, § 10 of the West Virginia Constitution. Indeed, the City argues that this claim was barred under our immunities statutes. There is no dispute among the parties that a private cause of action exists where state government, or its entities, cause injury to a citizen by denying due process. To suggest otherwise, would make our constitutional guarantees of due process an empty illusion. As under § 1983, the plaintiff must show that there was a constitutional violation, and that the claim is not barred by an applicable immunity.

■ We need not decide whether the complaint or evidence is sufficient to establish the state constitutional claim, because we find that liability is barred by the West Virginia Immunity Statute. West Virginia Code, 29–12A–5(a), of the Act provides in relevant part that:

(a) A political subdivision is immune from liability if a loss or claim results from:

(1) Legislative or quasi-legislative functions; [or]

\* \* \* \* \* \*

(9) Licensing powers or functions including, but not limited to, the issuance, [or] denial ... of ... any permit[.]

■ In statutory immunity cases, the starting point for interpretive analysis is always the language of the statute itself. Indeed, one of the foremost canons of statutory construction states: "The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters." *United States v. Ron Pair Enters.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quotation and brackets omitted). According to the City of Huntington, the intent of the West Virginia Legislature is clearly discernible from the statutory text and the purpose of the statute.[14] We agree.

**14.** Judge-made extensions and exceptions to the plain meaning of a statute are not lightly undertaken. As the United States Supreme reiterated in its most recent decision regarding statutory interpretation: "[i]n the ordinary case, absent any indication that doing so would frustrate [the legislature's] clear intention or yield patent absurdity, [a court's] obligation is to apply the

The "plain meaning" doctrine is not rendered inapplicable whenever a creative party is able to posit possible alternative meanings for statutory language, no matter how tenuous or improbable. To read into these words anything but a grant of absolute immunity would take us beyond the plain meaning of the statute. Moreover, we find that our decision in *Hose v. Berkeley County Planning Commission,* 194 W.Va. 515, 460 S.E.2d 761(1995), is dispositive of the state claim. In *Hose,* the defendants, Berkeley Planning Commission and its engineer, approved of plans and issued a permit to change the flow of surface water, which eventually caused damage to the property of the plaintiff. The plaintiff filed suit over the property damage alleging, among other things, that the defendants were negligent in approving of the plan and issuing the permit to allow the change in the flow of water. The trial court granted summary judgment to the defendants, on the basis of governmental immunity from liability under the Act. We affirmed the trial court's grant of summary judgment against the government defendants in the case. In doing so, we held in Syllabus Points 4 and 5 of *Hose* that:

> "Pursuant to W.Va.Code, 29–12A–4(c)(2) [1986] and W. Va.Code, 29–12A–5(a)(9) [1986], a political subdivision is immune from liability if a loss or claim results from licensing powers or functions such as the issuance, denial, suspension or revocation of or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authority, regardless of whether such loss or claim is caused by the negligent performance of acts by the political subdivision's employees while acting within the scope of employment." (Emphasis added).

> "W. Va.Code, 29–12A–5(a)(9) [1986] clearly contemplates immunity for political subdivisions from tort liability for any loss or claim resulting from licensing powers or functions such as the issuance, denial, suspension or revocation of or failure or refus-

al to issue, deny, suspend or revoke any permit, license certificate, approval, order or similar authority, regardless of the existence of a special duty."

We need go no further. The conclusion reached in *Hose* remains unscathed. Statutory interpretation should not flash on and off like the "lights at a discotheque, shining brightly at the time of one lawsuit and then vanishing mysteriously in the interlude before the next suit appears." [15] Had the circuit court properly applied W. Va.Code, 29–12A–5(a)(9), to this action, it would have dismissed all state law claims as a matter of law. Being aware of the state immunities laws, the plaintiff presumably added a second claim to his complaint. It is that count alone that gives the plaintiff a valid reason for bringing this lawsuit.

### B.

#### *Title 42, § 1983 Claim*

Unquestionably, the circuit courts of West Virginia, being courts of general jurisdiction, have original jurisdiction to hear and resolve claims under Title 42, U.S.C.A. § 1983. *Howlett v. Rose,* 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990); *Mitchem v. Melton,* 167 W.Va. 21, 277 S.E.2d 895 (1981). Title 42, U.S.C.A., § 1983 provides in pertinent part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."

This civil rights statute does not create substantive rights, but merely provides a claim for relief for rights elsewhere secured. Thus, § 1983 claims must specifically allege a violation of the constitution or "laws" of the United States. *See Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694, n. 3, 61 L.Ed.2d 433 (1979). In order to recover

statute" as written. *Hubbard v. United States,* 514 U.S. 695, ——, 115 S.Ct. 1754, 1759, 131 L.Ed.2d 779 (1995) (citation and internal quotation marks omitted).

15. *Strickland v. Commissioner, Maine Department of Human Services,* 96 F.3d 542, 547 (1st Cir. 1996).

damages under § 1983, a plaintiff must show that (1) "the conduct complained of was committed by a *person* acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). There is no reasonable dispute that the action in this case was taken under color of state law.

Because the plaintiff's claim is not based on ordinary negligence or tort principles but on a federal civil rights statute, the City of Huntington cannot be held liable under the doctrine of *respondeat superior* for the misconduct of its employees or agents. The City can only be held liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Thus, although the City may not be held liable for a constitutional tort under § 1983 on the theory of vicarious liability, it can be held responsible as an entity when the plaintiff's injury results from a municipal policy or custom. A local government "policy" is made when an official or official body possessing final authority with respect to the action issues a proclamation, regulation, or decision. This is consistent with the United States Supreme Court's narrow construction of municipal liability under § 1983 since *Monell;* limiting municipal liability to only those constitutional torts actual-

ly caused by the municipality. *See* Michael T. Burke & Patricia A. Burton, *Defining The Contours of Municipality Liability Under Title 42 U.S.C. § 1983: Monell Through City of Canton v. Harris*, 18 Stetson L.Rev. 511, 547 (1989).[16]

Considering that this lawsuit has been reduced exclusively to a claim against the City of Huntington,[17] our initial task here is to determine which person's edicts or acts represent the official policy of the City of Huntington with respect to granting and denying building permits. Without doubt, the Mayor of the City of Huntington falls within those policymaking authorities whose acts and conduct may be taken as the official business of the City of Huntington.[18] It is a closer issue regarding the other actors in this case, Mr. Dixon, Planning Supervisor, and the Planning Commission. The United States Supreme Court has provided guidance in determining "where policymaking authority lies for purposes of § 1983." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). First, "whether a particular official has 'final policymaking authority' is a question of state law." *Jett*, 491 U.S. at 737, 109 S.Ct. at 2723. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). Second, "the identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question to be resolved by the trial judge *before* the case

**16.** We need not address the issues of causation or the excessiveness of damages in the instant case because they were not specifically assigned as error on appeal. We note, however, that proof of the existence of either or both is insufficient to maintain a § 1983 action. The plaintiff bears the burden of proving that the municipal policy was the cause of the actual injuries suffered.

**17.** Because the City is the only remaining party to this action, there is no need for us to discuss qualified or statutory immunities. *See Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (good-faith immunity defenses unavailable for local government en-

tities in § 1983 actions). Similarly, state immunity laws are not applicable to § 1983 actions. *Howlett v. Rose, supra,* (in § 1983 litigation in state courts, a state may not create an immunity greater than the federal immunity).

**18.** Who is a policymaker is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 142, 108 S.Ct. 915, 933–34, 99 L.Ed.2d 107 (1988). In looking to state law, a court must determine which official has final, unreviewable discretion to make a decision or take an action. It is undisputed that the Mayor was a policymaker.

is submitted to the jury." *Jett,* 491 U.S. at 737, 109 S.Ct. at 2724.

"Reviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Id.* (citation omitted).

■■■ In reference to Mr. Dixon's specific responsibilities and authority, the record is horribly undeveloped. Also, the trial court failed to make the appropriate findings for the § 1983 claim. Nevertheless, we believe the facts are sufficient for us to find, as a matter of state law, that Mr. Dixon's acts and conduct qualify as those of the official policy of the City. We also believe that the Planning Commission itself falls within the range of policy makers for the City of Huntington. *Monell*'s language makes clear that the conduct of officials "whose acts or edicts may fairly be said to represent official policy" may give rise to municipal liability under § 1983. *Pembaur,* 475 U.S. at 480, 106 S.Ct. at 1298 (citations omitted). "[M]unicipalities often spread policymaking authority among various officers and official bodies. As a result, particular officers may have authority to establish binding [municipal] policy respecting particular matters and to adjust that policy for the [municipality] in changing circumstances." *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300.

■■■ Applying these standards, we hold that Mr. Dixon and the Planning Commission had authority to establish binding municipal policy respecting building permits. Of course, the fact that a municipal employee exercises discretion in making a decision is not enough to establish policymaking authority. *Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 925. Furthermore, the fact that the official policymaker simply goes along with a subordinate's discretionary decision is not a delegation of policy-making authority. The United States Supreme Court has precluded the possibility of finding a municipal employee to possess "de facto policy making authority."

*Praprotnik,* 485 U.S. at 131, 108 S.Ct. at 928 (stating that "except perhaps as a step towards overruling *Monell* and adopting the doctrine of *respondeat superior,* ad hoc searches for officials possessing such '*de facto*' authority would serve primarily to foster needless unpredictability in the application of § 1983"). However, a different situation arises where "a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker." *Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 928. Also, a series of decisions by a subordinate official could constitute a "custom and usage" of which the supervisor must have been aware. *Cf.* Steven Stein Cushman, *Municipal Liability under § 1983: Toward a New Definition of Municipal Policymaker,* 34 B.C.L.Rev. 693 (1993) (analyzing lower-court interpretations of *Praprotnik* and offering a broader definition de facto policymakers). In either situation, "the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower ranking official." *Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 928.

The next step in analyzing this § 1983 claim is to identify the specific civil right alleged to have been violated. According to the complaint, "[t]he action of the defendants denied plaintiff of his civil rights under 42 U.S.C. § 1983 and deprived plaintiff of his property rights without due process of law." The action plaintiff points to is the administrative "delay" in granting his permit. He claims that the delay was the result of a "conspiracy" between the mayor and others, that it was "illegal and improper," and that it was designed to deprive him "of certain constitutional rights without due process of law."

■■■ The Fourteenth Amendment's Due Process Clause provides that the State may not "deprive any person of life, liberty, or property, without due process of law." To determine whether the City committed such a violation, we must determine, first, whether the plaintiff had a "liberty" or "property" interest subjected to deprivation and, second, whether the deprivation occurred "without due process of law." *E.g., Gomez v. Toledo,* 446 U.S. at 640, 100 S.Ct. at 1923–24; *Math-*

ews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

 Although the Constitution protects property interests, it does not create them. To decide whether plaintiff had a property interest at stake, we look to see whether some independent source, such as federal, state, or local law, has created an enforceable expectation.[19] To have a property interest, the plaintiff must demonstrate "more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it" under state or federal law. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Additionally, the protected property interest is present only when the individual has a *reasonable* expectation of entitlement deriving from the independent source. State laws therefore guide us in deciding whether plaintiff possessed only an unprotected unilateral expectation of a claim of entitlement, or instead had a constitutional-protected "legitimate claim of entitlement." *Id.*

 In this case, our law of real property confers on the plaintiff a right, subject to reasonable regulation, to use his property as he sees fit and to build on it what he wants.[20] The City's regulatory powers include its ability to impose reasonable conditions on plaintiff's right through, for example, zoning and permitting laws. Requiring the plaintiff to obtain a building permit before he can build on his own property is a restraint on his property rights. Therefore, the permit cannot be denied except upon the provision of an adequate procedure, i.e., a process that is due. In other words, the "entitlement" created by state law in this case is not that the plaintiff is automatically entitled to a building permit. Rather, the entitlement is found in the bundle of rights that attaches to the plaintiff's fee simple ownership in his land. The City's permitting process may qualify plaintiff's use of his bundle, but it cannot do so without giving him the process that the Fourteenth Amendment says is his due. After all, it is a fundamental requirement of due process to be given "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333, 96 S.Ct. at 902 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)).

 Because plaintiff had a cognizable property interest at stake, we proceed to address whether the procedures he received

---

**19.** That determination is a legal question for the court to decide, and as a question of law, it is subject to our *de novo* review.

**20.** Although contract law recognizes a "legitimate claim of entitlement" to individuals who act with reasonable reliance on the assertions of others, the plaintiff cannot use that doctrine in this case to create a property interest out of the statements made to him by Mr. Dixon prior to plaintiff's investment in the property. Though Mr. Dixon's communication may well have seemed to be reasonable and authorized at the time, the upshot of the web of legal rules requiring proof of a state actor's actual authority is that apparent authority cannot serve as a means of holding a state, county or municipal sovereign to a contract. This means that if the state actor did not possess actual authority to make a commitment, the legitimate claim of entitlement fails. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) ("anyone entering into an arrangement with the Government takes the risk of having ascertained that he who purports to act for the Government stays within the the bounds of his authority"). So it is here.

If more is needed—and we doubt that it is—policy rationales for this rule can be extrapolated from the closely related theory that equitable estoppel is generally inapplicable to the state governmental units when its employees induce reliance by their unauthorized actions or comments. Thus, while the equities of those circumstances obviously, and rightly, influenced the perceptions of several of the City's council members, *see* n. 3, *supra*, they are no help to the plaintiff because there is no estoppel against the government, and such an estoppel argument cannot, therefore, be used to create a property interest for due process purposes. *See Freeman v. Poling*, 175 W.Va. 814, 819, 338 S.E.2d 415, 420 (1985) ("The general rule is that an estoppel may not be invoked against a governmental unit when functioning in its governmental capacity."). Judicial enforcement of these authorized comments by Mr. Dixon would expand the power of certain municipal officials beyond specific legislative limits, thereby raising serious separation of powers concern. Furthermore, enforcing such agreements or understanding would put the public purse at substantial and undue risk.

were adequate.[21] In the context of a permitting system, due process requires, at a minimum, that a properly made application be addressed on the merits pursuant to articulated standards and in a reasonably timely manner.[22] "The public has the right to expect its officers to observe prescribed standards and to make adjudications on the basis of merit.... [A]bsolute and uncontrolled discretion invites abuse." *Hornsby v. Allen*, 326 F.2d 605 (5th Cir.1964) (city could not willy-nilly decide which applicants received liquor licenses); *accord, e.g., Holmes v. New York City Housing Auth.*, 398 F.2d 262 (2nd Cir.1968) (where 90,000 applications were received annually for 10,000 public housing openings, "due process require[d] that selections among applicants be made in accordance with 'ascertainable standards'"); *see also Major v. DeFrench*, 169 W.Va. 241, 254, 286 S.E.2d 688, 696 (1982) (due process "protect[s] people from arbitrary state interference with their right to pursue a lawful occupation by demanding procedural regularity from government when it licenses private employment"); *State ex rel. McLendon v. Morton*, 162 W.Va. 431, 439–41, 249 S.E.2d 919, 923–24 (1978), and cases cited therein; *State ex rel. Bronaugh v. City of Parkers-*

*burg*, 148 W.Va. 568, 575, 136 S.E.2d 783, 787 (1964). Obviously, plaintiff in this case could not quibble with the City's standards or its treatment of the merits of his application because it granted him the permit. Thus, the only possible procedural complaint, and the one on which plaintiff relies, is that the four-month delay violated his due process rights.[23] We reject that contention; the four-month turn around time on plaintiff's permit application was not, in the circumstances of this case, so unreasonable as to offend the basic notions of fairness embodied in the Due Process Clause. Indeed, we would hamstring governmental efforts to investigate relevant facts and conscientiously consider applications if we were to impose so strict a deadline, as a matter of constitutional law. Although there are limits on official delays, and refusals to decide can be tantamount to arbitrary rejections violative of due process,[24] this case does not come close to exceeding the limits of fairness and reasonableness. The following explains that conclusion.

■ This Court cannot set definite temporal boundaries for determining when a particular delay caused by a state actor's

21. The requirements of due process are not reducible to a static formula, but rather are sensitive to the facts and circumstances of a given case. While in this case the fundamental requirement of due process allows the plaintiff a fair opportunity to have his request for a building permit considered in a meaningful manner, the concept is flexible, calling for procedural protection as dictated by the particular circumstances. *See Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). The determination of the appropriate form of procedural protection requires an evaluation of all the circumstances and an accommodation of competing interests. While the individual's right to fairness must be respected, the City has a parallel duty to protect the health, safety and welfare of its citizenry.

22. Whether due process also requires an opportunity for some administrative or judicial review of permit denials is an issue that is not presented in this case, and is one that we, therefore, need not address. We note that the plaintiff had the alternative of appealing the Planning Commission's initial refusal to give him a building permit in a timely fashion. The Codified Ordinances of Huntington, § 1743.10(a) (1992) specifically states, in relevant part:

"(a) *Appeals.* Whenever any person is aggrieved by a decision of the Director of Plan-

ning ... it is the right of that person to appeal to the Board of Zoning Appeals[.]"
The plaintiff failed to invoke this provision.

23. Liability under § 1983 may be premised not only on action, but a refusal to act. *See United States v. City of Yonkers*, 96 F.3d 600, 613 (2nd Cir.1996). Indeed, "[g]overnment officials may be held liable under § 1983 for a failure to do what is required." *Doe v. New York City Department of Social Services*, 649 F.2d 134, 141 (2nd Cir.1981), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). *See also Duchesne v. Sugarman*, 566 F.2d 817, 832 (2nd Cir.1977) ("[w]here conduct of the supervisory authority is directly related to the denial of a constitutional right it is not to be distinguished, as a matter of causation, upon whether it was action or inaction").

24. *See Allen v. West Virginia Human Rights Comm.*, 174 W.Va. 139, 324 S.E.2d 99 (1984) (years of delay in processing Human Rights cases violated due process and equal protection); *State ex rel. Taylor v. MacQueen*, 174 W.Va. 77, 322 S.E.2d 709 (1984) (delay of approximately two years in ruling in a case violated Art. III, § 17 of the W.Va. Const.).

misconduct rises to constitutional dimension; the flexibility required by due process doctrines and the range of variables that can affect fairness in this context preclude our imposing specific time limits. An analogy between speedy trials and prompt administrative action in issuing permits is not perfect. Still, the comparison is a good one: both situations involve state action that can cause delay in having one's case heard and decided in a timely fashion to the potential prejudice of one's rights. Indeed, in *United States v. Eight Thousand Eight Hundred & Fifty Dollars,* 461 U.S. 555, 562–64, 103 S.Ct. 2005, 2010–12, 76 L.Ed.2d 143 (1983), the United States Supreme Court deemed the speedy trial analysis analogous to the question whether the government's delay in filing a civil forfeiture proceeding violated an individual's due process right to a hearing in a timely fashion. Drawing on that analogy, then, we hold that the analysis should encompass a variety of factors such as the length of the delay, the reason for the delay, the harm caused by the delay, and what other alternatives to relief were available. These considerations should be employed in determining whether one's due process right against oppressive administrative delay has been violated.

 Clearly, the most important of the factors is the reason for the delay. Deliberate and unjustifiable delay weighs heavily in favor of finding breach of the due process constitutional right. Where there is evidence of malice and a conspiracy or a deliberate intent to impede the administrative process for vindictive purposes, the showing of prejudice need only be minimal. Although doctrines such as *de minimis non curat lex* may be relevant to due process inquiry, *see Hessel v. O'Hearn,* 977 F.2d 299, 303–04 (7th Cir.1992), they have little, if any, application to deliberate wrongs. It cannot be ignored that one of the fundamental purposes of § 1983 is deterrence. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole,* 504 U.S. 158, 161, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (1992) (citing *Carey v. Piphus,* 435 U.S. 247,

254–257, 98 S.Ct. 1042, 1047–49, 55 L.Ed.2d 252 (1978)). Even if the damage done to the plaintiff is small, as long as the damages effectuate the policies underlying § 1983, the goals of § 1983 urge availability of damages.

 Application of the above analysis to this case requires us to reject plaintiff's claim. It must be underscored that the plaintiff's only claim can be that the process for his building permit was delayed illegally. The Due Process Clause does not require a municipality to implement its laws without a hitch or with precision. As courts have stated repeatedly, "[t]he power to decide, to be wrong as well as right on contestable issues, is both [a] privilege and curse of democracy." *National Paint & Coatings Ass'n. v. City of Chicago,* 45 F.3d 1124, 1127 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995). The City articulated valid concerns providing it with a reasonable basis to postpone granting the plaintiff his permit. That those concerns ultimately proved to be unfounded in no way lessens the legitimacy of the City's decision to look into them. Indeed, the City had that responsibility. The plaintiff has neither shown nor alleged that the delay was based on a suspect characteristic or was a retaliation for the exercise of a civil right. This is not, then, a case in which there is a basis for finding an unconstitutional motive. The Fourteenth Amendment does not authorize this Court to sit as a super-executive to judge the wisdom or the desirability for an investigation and delay in ruling on an application for a building permit. We also agree with the City that the length of the delay was minimal and that the plaintiff's plight was neither significant nor out-of-the-ordinary compared to normal administrative delays.

 Finally, the plaintiff claims that the relevant laws of Huntington created a property right that afford him relief. He apparently contends that the City lacked any discretion to deny, even temporarily, his permit. A careful and extensive review of the statutes and ordinances indicates, however, that the Planning Commission of the City of Huntington is vested with some discretion in determining whether to issue municipal

building permits. The language of the Codified Ordinances of Huntington, § 1743.09(b) (1992), provides in relevant part:

"(b) *Approval of Permits and Plans.* All permits and plans shall be approved only after it has been determined that the proposed work to be undertaken will be in conformance with the requirements of the state and all other applicable codes and ordinances."[25]

This law and this record simply do not support the plaintiff's position that the Planning Commission had no authority to evaluate, investigate, and deliberate over his application. Plaintiff would have us hold that the permitting process is designed to provide nothing more than notice to the City that he is undertaking a construction project. A far more reasonable interpretation, however, is that building permit *applications* provide the City with notice, which then enables it to determine whether the proposed project would threaten some other codified policy. Such an interpretation furthers not only the City's interests that support the permitting process, but also those interests that prompted enactment of various regulatory laws. Indeed, the conditional nature of the permitting procedure can benefit property owners who otherwise might proceed to invest sums of money in a building project only to learn later what a reasonable investigation would have uncovered, *i.e.*, that the building violates some zoning, environmental, or other law. We also believe that more than an asserted thirty-day time limitation[26] placed on the decisionmaker to act is necessary to justify *post hoc* liability. *See Board of Pardons v. Allen,* 482 U.S. 369, 382, 107 S.Ct. 2415, 2422–23, 96 L.Ed.2d 303 (1987) ("to give rise to a protected [property] interest, the statute must act to limit meaningfully the discretion of the decisionmaker") (O'CONNOR, J., dissenting). Although we have held

that due process requires governmental agencies to comply with their own regulations, *State ex rel. Wilson v. Truby,* 167 W.Va. 179, 281 S.E.2d 231 (1981); *Trimboli v. Board of Educ.,* 163 W.Va. 1, 254 S.E.2d 561 (1979); *see also Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 65, 459 S.E.2d 329, 342 (1995), we have also refused to confer substantive entitlements on claimants simply because an agency failed to comply strictly with a particular time deadline. *Allen,* 174 W.Va. at 159 n. 24, 324 S.E.2d at 119 n. 24.

The plaintiff has failed to demonstrate that the City's procedures were unfair or otherwise deficient under the Fourteenth Amendment. His § 1983 claim therefore fails. In reversing a jury verdict in a civil action, we are cognizant that in determining whether a valid claim has been established, the assessment of evidence and testimony is, of course, within the province of the trier of fact, and that we, as an appellate court, owe great deference to the verdict. Furthermore, we recognize that evidence is sufficient if a rational trier of fact could have found the essential elements of the claim by a preponderance of the evidence based on the evidence presented at trial. Nevertheless, a civil claim is not necessarily beyond the reach of a dispositive motion merely because the plaintiff asserts its validity. In this instance, to prove that a brief four-month delay in granting a building permit is atypical or unusual and therefore capable of taking the delay out of the mere *de minimus* category, the plaintiff must come forth with affirmative evidence to show improper motive and intent to harm. We find no such evidence in this case. We hold the threshold evidentiary standard has not been met to establish a trialworthy issue under the requirements of § 1983. Accordingly, we reverse and order that this action against the City of Huntington be dismissed.

---

**25.** In W.Va.Code, 8–12–14 (1992), it states in relevant part:

"The governing body of every municipality has plenary power and authority to require a permit as a condition precedent to the erection, construction, repair or alteration of any structure or of any equipment or part of a structure which is regulated by state law or municipal ordinance[.]"

**26.** During oral argument, it was indicated that the Mayor was empowered by appropriate regulations to impose a thirty-day moratorium on the issuance of a building permit while his office investigated concerns derived from a permit request. It is not clear, however, whether there was anything in the regulation that would preclude the Mayor from imposing successive moratoria in order to complete an investigation.

### III.

### CONCLUSION

For the reasons set out herein, the final judgment is reversed, and the action is dismissed.

Reversed.