# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2015 Term

_____

No. 14-1113

_____

**FILED**
**November 10, 2015**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**DEPUTY J.K. MASTON,**
**TYLER COUNTY SHERIFF'S DEPARTMENT,**
**TROOPER S. CURRAN, and**
**WEST VIRGINIA STATE POLICE,**
Defendants below, Petitioners

v.

**THOMAS JEFFERSON WAGNER,**
Plaintiff below, Respondent

_____

Appeal from the Circuit Court of Tyler County
The Honorable David W. Hummel, Judge
Civil Action No. 11-C-12

**AFFIRMED**

_____

Submitted: September 23, 2015
Filed: November 10, 2015

Gary E. Pullin, Esq.                          David A. Jividen, Esq.
Emily L. Lilly, Esq.                          Chad D. Haught, Esq.
Michelle Rae Johnson, Esq.                    Jividen Law Offices, PLLC
Pullin, Fowler, Flanigan,                     Wheeling, West Virginia
Brown & Poe, PLLC                             Counsel for the Respondent
Charleston, West Virginia
Counsel for the Petitioners


**JUSTICE KETCHUM delivered the Opinion of the Court.**

SYLLABUS BY THE COURT

1. "A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syllabus Point 2, *Robinson v. Pack*, 223 W.Va. 828, 679 S.E.2d 660 (2009).

2. "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

3. "The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition." Syllabus Point 1, *Hutchison v. City of Huntington*, 198 W.Va. 139, 479 S.E.2d 649 (1996).

4. "Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being

i

mulcted in damages if he does." *Bennett v. Coffman*, 178 W.Va. 500, 361 S.E.2d 465 (1987).

5. "To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability." Syllabus Point 11, *W.Va. Reg'l Jail & Corr. Facility Auth. v. A.B.,* 234 W.Va. 492, 766 S.E.2d 751 (2014).

6. "The subjective motivations of a police officer are not relevant to a determination of whether qualified immunity exists in connection with allegations of an unreasonable search and seizure, an unlawful detention, or the use of excessive force." Syllabus Point 4, *Robinson v. Pack*, 223 W.Va. 828, 679 S.E.2d 660 (2009).

Justice Ketchum:

In this appeal from the Circuit Court of Tyler County, a plaintiff contends that he was improperly arrested by a deputy sheriff and a state trooper. The plaintiff claims that a reasonable jury could find that the law enforcement officers arrested him without probable cause to do so, and that they unreasonably used excessive force that injured him during the arrest, in violation of his constitutional and statutory rights. The law enforcement officers (and their employers) contend that their actions were protected by the doctrine of qualified immunity.

In an order dated September 24, 2014, the circuit court refused to afford the law enforcement officers qualified immunity and denied the officers' motion for summary judgment. The circuit court determined that there were numerous disputes about the material facts supporting the immunity determination, disputes that should be resolved by a jury.

On appeal by the law enforcement officers (and their employers), we too find substantial questions of material fact exist in the record for jury resolution. As set forth below, we affirm the circuit court's order declining to afford the officers qualified immunity.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

Shortly after midnight on Saturday, April 11, 2009, plaintiff Thomas J. Wagner walked out of Big C's Lounge in the small town of Middlebourne, West

1

Virginia. Mr. Wagner was then a fifty-year-old, heavy-set, balding boilermaker who owned the apartment building across from the Tyler County courthouse and owned and operated a local feed store. Mr. Wagner lived in his apartment building. Both Mr. Wagner and a bartender say he had two or three beers in the two or three hours he was at the bar. Both also attested that it was raining when he left.

Big C's Lounge is located on Main Street about 70 yards north of Mr. Wagner's apartment. The bar is at 212 Main Street; Mr. Wagner's residence was one block down at 120 Main Street, across from the courthouse.

Mr. Wagner walked south on the sidewalk until he reached the intersection of Main and a crossroad. On Mr. Wagner's side of Main, the crossroad is named Dodd Street; on the opposite side of Main, it is called Court Street. Mr. Wagner stopped to look for traffic before crossing Dodd Street and saw a State Police cruiser parked on Court Street with two officers inside who were watching him. He contends that he turned to the police cruiser and asked "[i]f everything was okay" or if something was wrong that he should be aware of for himself and his tenants. As Mr. Wagner testified in his deposition, "There's the cruiser with the engine running, [head]lights on. Hasn't budged an inch since the whole time I get down the street. I own this apartment building right here (indicating [on map]). My concern is for these people here. Is there something I should be aware of[?]" When he did not receive a response to his inquiry, Mr. Wagner "[a]sked again, is everything all right[?]" Mr. Wagner observed the police cruiser window come halfway down, but heard no response.

2

At this point, it began to rain harder. Mr. Wagner says he pulled his sweatshirt hood up over his head and "hustled down the street" to his residence that was 15 to 20 yards down the sidewalk. As he reached the apartment building, he turned down a gravel driveway that paralleled the building's porch.

The next thing Mr. Wagner recalled was someone "crashing" into his back, simultaneously grabbing his right arm and slamming his face into the spindles of the porch railing. As his arm was being pulled behind his back, Mr. Wagner said he felt an explosion of extreme pain. Mr. Wagner quickly realized that he was being confronted by the two law enforcement officers he had seen moments before.

Defendant Joshua Maston, a sheriff's deputy working for the Tyler County Sheriff's Department, was the individual who had pushed and grabbed Mr. Wagner. Defendant Shaun Curran, a trooper (now corporal) working for the West Virginia State Police, had been driving the State Police cruiser and helped Deputy Maston handcuff Mr. Wagner.

A tenant of the apartment building, Lillian (Burch) Leeson, heard a commotion and went out on the porch to investigate. According to her deposition testimony, Mr. Wagner was pressed up tight to the porch by the officers. She said, "He couldn't have moved if he wanted to." At the same time, she heard Mr. Wagner ask the officers why they were hurting him. She also heard Mr. Wagner tell the two officers he lived in the building and was going home. Mrs. Leeson said it was pouring down rain; when the officers asked Mr. Wagner "why he was running" he replied "that he was trying to get in out of the rain." Mrs. Leeson never heard Mr. Wagner yell at the officers.

3

Mr. Wagner said he believed the officers had broken his arm and asked them to take him to the hospital. Thereafter, the officers transported him to a hospital where blood was cleaned from his face. Mr. Wagner also received an injection of pain medication and an arm sling. Mr. Wagner then spent the remainder of the night in a regional jail before appearing before a magistrate in the morning.

Subsequent medical testing revealed that Mr. Wagner had suffered a complete tear of the common extensor tendon and radial collateral ligament in his right elbow. He later underwent reconstructive surgery on his elbow with an allograft cadaver Achilles tendon, and healed wearing a cast and elbow brace.

Deputy Maston and Trooper Curran offer an account of the arrest that conflicts with that of Mr. Wagner. Additionally, factual differences exist between the story told by Deputy Maston and the one told by Trooper Curran, and between each officer's written statement made shortly after the arrest and the officer's later deposition testimony.

Deputy Maston and Trooper Curran received a call at 12:07 a.m. of an altercation at 301 Main Street in Middlebourne, about a block north of Big C's Lounge. They responded in Trooper Curran's police cruiser with Deputy Maston riding as a passenger. Upon arriving at the scene they found no altercation and no people. By 12:19 a.m., the officers told the dispatcher they had cleared the scene and found nothing. However, as the officers drove south down Main Street they noticed a man and woman leaving Big C's Lounge, in an intoxicated state, walking toward a vehicle. Trooper Curran turned onto Court Street, turned around, and parked in a position to watch Big C's

4

Lounge and see if the intoxicated couple attempted to drive the vehicle.[1]  The intoxicated couple, likely seeing the police cruiser, then walked back into the bar.

Several minutes later, Mr. Wagner walked out of Big C's Lounge.  Deputy Maston "had a pretty good idea [] from the physical features" that it was Mr. Wagner, and "[f]or sure I knew who it was when he got to the corner" of Dodd and Main Street.  Mr. Wagner's sister was employed as a Tyler County magistrate assistant, and his brother owned a local medical supply business.  Deputy Maston had exchanged pleasantries with Mr. Wagner in the courthouse (when Mr. Wagner visited his sister) and around town on a number of occasions, and never knew him to be violent or a danger to others.  Deputy Maston said to Trooper Curran, "I believe that's Mr. Wagner."  Trooper Curran testified that he too recognized Mr. Wagner from talking to him at the magistrate court but was not as familiar with him as Deputy Maston.

Trooper Curran's written report described Mr. Walker as "walking" from the bar to the intersection of Dodd and Main Streets, and his criminal complaint said Mr. Walker was "traveling on foot south along the sidewalk."  Only Deputy Maston's report said he was "staggering."  However, neither officer had any intention of stopping or arresting him.  Both officers agree that Mr. Wagner stopped to look for traffic, but then turned toward the police cruiser, raised his arms, and said something.  The officers

_____

[1] A written report by a State Police supervisory trooper gives a different reason for why Trooper Curran parked his cruiser:  "TFC Curran stated that he did not see any fight in Middlebourne along [M]ain [S]treet.  He decided to park his vehicle and see if anyone came walking down the street or if the victim came to his cruiser."

testified they heard sound but could not understand what Mr. Wagner was saying because their windows were up, so Trooper Curran rolled down his window. Deputy Maston wrote that Mr. Wagner "yelled if we need anything," but Trooper Curran said he heard Mr. Wagner "shouting profanities and acting in a manner to provoke an altercation." Again, at this point the officers said they had no intention of stopping or arresting Mr. Wagner.

The officers say that Trooper Curran told Mr. Wagner to go home,[2] and both agree the trooper had to yell in an attempt for Mr. Wagner to hear him. The officers assert that Mr. Wagner yelled something back and threw his arms up in the air. Trooper Curran may have again told Mr. Wagner to go home. According to the officers, Mr. Wagner did not move and yelled something toward the cruiser. Trooper Curran testified to clearly hearing obscenities and immediately telling Deputy Maston what he heard; Deputy Maston says the trooper said nothing about hearing obscenities until several days later.

Next, Trooper Curran allegedly told Mr. Wagner to "stay right there," but again both officers testified they had no intention of stopping or arresting him.[3] Mr.

---

[2] Deputy Maston's report indicated that "Trooper Curran advised [Mr. Wagner] nothing was needed and go home," at which point Mr. Wagner "threw his arms up in the air and yelled something else." Trooper Curran testified he "told [Mr. Wagner] to go to his residence or [] get off the street," but Mr. Wagner did not move.

[3] Deputy Maston described why he had no intention of arresting Mr. Wagner at that point in time:

(continued . . .)

6

Wagner, however, began to jog or run south down the sidewalk. At this point, the officers decided to stop Mr. Wagner because, as Deputy Maston said, "Whenever somebody starts running from you after we tell them to stay there, then something's not right." Trooper Curran decided to arrest Mr. Wagner "when he started to run" because, he said, "Innocent people don't run."

Trooper Curran immediately drove his police cruiser left onto Main Street. However, the trooper did not activate his lights or siren, actions that would have automatically triggered an in-car audio and video system to start recording. The trooper also did not manually activate the audiovisual recording system. According to a written State Police policy, the recording system "shall be used for the purposes of accurately documenting the events, actions, conditions and statements made during . . . arrests," and "shall remain activated from the time that a [trooper] initiates contact with a traffic violator or other offender / suspect until such time as the violator has been released or placed in custody."

---

Q. . . . At this point, did you believe that Mr. Wagner was going to be under arrest, or were you just going to talk to him as he was going on?

A. At this point in time, actually, we knew who he was, we're friends with his sister due to the fact that we work with her, along those lines, not outside, social . . . and we would have got him just to his house or wherever he needed to go to get him out of the public view and get it over with. No, we didn't want to arrest him at that time.

7

Deputy Maston jumped out of the cruiser and began chasing Mr. Wagner down the street. Deputy Maston says he told Mr. Wagner to stop, but that seemed to make him run faster. As they reached the apartment complex, Deputy Maston was able to pin Mr. Wagner against the covered porch railing. Deputy Maston testified Mr. Wagner was holding his hands in front of his body, so the deputy used a wristlock that he was taught at the West Virginia State Police Academy to gain control of Mr. Wagner's hands. The officers contend Mr. Wagner was resisting Deputy Wagner's efforts, and was screaming and cussing. Once Deputy Wagner gained control of Mr. Wagner's right arm, Trooper Curran restrained the left arm when he reached the porch. Still, the officers assert Mr. Wagner continued to resist before he could be handcuffed.

Once Mr. Wagner was restrained, the officers say he refused to answer questions until he received medical treatment and questioned the "officers' reasoning for attempting to stop him." However, after Mr. Wagner was handcuffed, the officers could smell an alcoholic beverage on his breath. They also noted his speech was slurred and his eyes red and glassy.

When Mr. Wagner complained of arm pain, the officers immediately transported him to a nearby hospital. Hospital medical personnel noted a strong smell of alcohol on the plaintiff's breath. Mr. Wagner's sister also said he appeared intoxicated when she arrived at the hospital.

A senior, supervisory trooper was called to the hospital to conduct a use of force investigation, and he too noted a strong odor of alcohol on Mr. Wagner's breath. He asked Mr. Wagner if he wished to give a statement "on how he came into contact with

8

the officers that had arrested him." Mr. Wagner told the supervisory trooper he "was not qualified to take his statement and he did not want to talk" to him. The supervisory trooper also spoke with Trooper Curran and Deputy Maston, and later drafted a report (titled "Response to Resistance and Aggression – Hands On") concluding that the use of force against Mr. Wagner complied with department policy and procedures.

The ostensible reasons for Mr. Wagner's arrest shifted, from the time he was handcuffed until he was formally charged. Trooper Curran stated in his deposition that, initially, he orally advised Mr. Wagner that he was under arrest for two offenses: fleeing from a police officer on foot and disturbing the peace. Deputy Maston's written report describing the arrest said Mr. Wagner was advised he was being arrested for fleeing on foot and for public intoxication. Trooper Curran's written report expands those charges to four, and said that Mr. Wagner's actions led him "to be arrested and charged with Public Intoxication, Disturbing the peace, fleeing on foot, and refusal of a PBT."[4]

Sometime on April 11, 2009, after Mr. Walker was transported from the hospital to the regional jail, Trooper Curran filed a criminal complaint in the Magistrate Court of Tyler County. The criminal complaint formally stated four charges against Mr.

---

[4] Trooper Curran's mention of a "refusal of a PBT" means a preliminary breath test for alcohol. However, a breath test is only legally required when a defendant is suspected of driving a vehicle under the influence of alcoholic beverages. Trooper Curran admitted this was a mistake, and he never charged Mr. Wagner with this offense.

9

Wagner: public intoxication; disturbing the peace; fleeing on foot; and a new offense, obstructing and resisting an officer.

The prosecutor,[5] however, did not prosecute the charges. When the court issued a rule for the prosecutor to show cause for why the charges were not being pursued, the prosecutor did not respond. All four criminal charges were dismissed with prejudice on September 22, 2010.

On March 31, 2011, Mr. Wagner filed the instant civil suit seeking damages against Deputy Maston and Trooper Curran, as well as their respective employers, the Tyler County Sheriff's Department and the West Virginia State Police. The complaint generally alleged that the officers, in the scope of their employment, worked together to intentionally, recklessly, and/or negligently attack, assault and/or batter the plaintiff and to intentionally inflict emotional distress. The complaint also alleged that the two employers had failed to properly hire, train, discipline, and/or reprimand the officers, and had failed to adopt policies and customs to prevent similar conduct. Lastly, Mr. Wagner's complaint alleged that the acts and omissions of the defendants violated his rights under the West Virginia Constitution.[6]

---

[5] Prosecution of the charges was assigned to a special prosecutor, Judith McCullough, because the Tyler County Prosecutor had a conflict of interest arising from his rental of a building from Mr. Wagner.

[6] The plaintiff's complaint also alleged that the officers engaged in abuse of process and in malicious prosecution. The circuit court dismissed any part of the plaintiff's complaint pertaining to "false arrest/imprisonment" by order dated June 5, 2012.

After conducting discovery, the four defendants filed a motion for summary judgment. The defendants asserted that the officers' actions in arresting Mr. Wagner were entitled to qualified immunity, that is, the immunity afforded to government agencies, officials, and employees for discretionary activities taken in an official capacity. *See* Syllabus Point 1, *Bennett v. Coffman*, 178 W.Va. 500, 361 S.E.2d 465 (1987). The defendants argued that Deputy Maston and Trooper Curran acted in an objectively reasonable and legal manner when, acting within their discretion, they arrested Mr. Wagner. The State Police and Tyler County Sheriff's Department argued that the immunity extended to them as the officers' employers.

Mr. Wagner, however, contended that the officers' actions were not lawful, and asserted that government agencies and officials can be held liable when their discretionary conduct violates a person's established statutory or constitutional rights. Mr. Wagner argued that the evidence could be read to show that the two officers had neither an objectively nor a subjectively legitimate reason to detain Mr. Wagner as he was walking down the street. The officers repeatedly said they had no reason or intent to stop him. It was only when Mr. Wagner began running to his apartment – because, as he and two other witnesses said, it was raining heavily – that the officers decided to detain him. And only after he was detained and injured did the officers formulate specific charges against him, such as for public intoxication. Put succinctly, the plaintiff asserted that questions of fact about the reasonableness of the defendants' actions remained for jury resolution.

11

In an order entered September 25, 2014, the circuit court denied the defendants' motion for summary judgment. The circuit court found that any question regarding the truthfulness of the witnesses was for jury resolution. While law enforcement officers must, on a daily basis, make swift decisions to carry out their duties, the circuit court noted that those officers have a concomitant responsibility to do so reasonably and without violating a citizen's constitutional rights. The circuit court therefore declined to afford qualified immunity to the defendants because the record was "laden with genuine issues of material fact."[7]

The defendants now appeal the circuit court's summary judgment order refusing to dismiss the plaintiff's claims on the ground of qualified immunity.

---

[7] We note that the circuit court's order denying summary judgment contains few findings of fact and little discussion of the law. "[A] lower court's factual findings when ruling on summary judgment—whether denying or granting—must be sufficient to elucidate to this Court the basis for its ruling." *W.Va. Dep't of Health & Human Res. v. Payne*, 231 W.Va. 563, 569, 746 S.E.2d 554, 560 (2013). As we said in Syllabus Point 4 of *Payne*:

> A circuit court's order denying summary judgment on qualified immunity grounds on the basis of disputed issues of material fact must contain sufficient detail to permit meaningful appellate review. In particular, the court must identify those material facts which are disputed by competent evidence and must provide a description of the competing evidence or inferences therefrom giving rise to the dispute which preclude summary disposition.

*See also*, Syllabus Point 3, *Fayette Cty. Nat'l Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997) (*overruled on other grounds by Sostaric v. Marshall*, 234 W.Va. 449, 766 S.E.2d 396 (2014)) ("Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed.").

## II.
## STANDARD OF REVIEW

"This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syllabus Point 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002). An order denying a motion for summary judgment on the ground of qualified immunity is just such a "properly reviewable" order. As we said in Syllabus Point 2 of *Robinson v. Pack*, 223 W.Va. 828, 679 S.E.2d 660 (2009), "A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine."

A circuit court should grant summary judgment "only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W.Va. R. Civ. P., Rule 56(c) [1998]. "A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law." Syllabus Point 5, in part, *Jividen v. Law*, 194 W.Va. 705, 461 S.E.2d 451 (1995). In considering the evidence of record at the summary judgment stage, courts must apply the following guidelines:

> The circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the

13

matter but to determine whether there is a genuine issue for trial. Consequently, we must draw any permissible inference from the underlying facts in the most favorable light to the party opposing the motion. In assessing the factual record, we must grant the nonmoving party the benefit of inferences, as credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Summary judgment should be denied even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom. Similarly, when a party can show that demeanor evidence legally could affect the result, summary judgment should be denied.

*Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 59, 459 S.E.2d 329, 336 (1995) (citations and quotations omitted).

Similarly, we have generally recognized that, "The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine." Syllabus Point 1, in part, *Hutchison v. City of Huntington*, 198 W.Va. 139, 479 S.E.2d 649 (1996). Furthermore, a ruling on qualified immunity should be made early in the proceedings so that the expense of trial is avoided where the defense is dispositive. First and foremost, qualified immunity is an entitlement not to stand trial, not merely a defense from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

However, if there is a "bona fide dispute as to the foundational or historical facts that underlie the immunity determination," the determination of immunity shifts to a jury. Syllabus Point 1, in part, *Hutchison*, 198 W.Va. at 144, 479 S.E.2d at 654. "In this

14

connection, it is the jury, not the judge, who must decide the disputed 'foundational' or 'historical' facts that underlie the immunity determination, but it is solely the prerogative of the court to make the ultimate legal conclusion." 198 W.Va. at 149, 479 S.E.2d at 659. Accordingly, a circuit court may not summarily dispose of a claim on grounds of qualified or statutory immunity where there is a genuine issue of material fact underlying the immunity determination.

## III.
## ANALYSIS

The defendants – Deputy Maston and Trooper Curran, as well as their respective employers – assert that the circuit court erred when it found that the two officers were not entitled to qualified immunity as a matter of law. They assert the officers had an "articulable suspicion" that motivated them to stop plaintiff Wagner for questioning. When the officers instructed Mr. Wagner to stop, he ran until he was stopped after a pursuit. The evidence – from the perspective of the officers, hospital staff, a supervisory trooper, and the plaintiff's sister – indicated that the plaintiff's eyes were red and glassy, his speech was slurred, he smelled of alcohol, and he appeared intoxicated. The defendants contend that any fair reading of these factors gave the officers probable cause to stop and arrest Mr. Wagner.

The plaintiff, however, asserts that his alleged intoxication did not motivate his arrest, but was only discovered by the officers after he was improperly detained and injured. Mr. Wagner contends that the two officers had identified him as he walked in the rain and knew he was no threat to them or the public. Further, the officers repeatedly

15

testified that they had no intention of stopping or arresting Mr. Wagner as he walked down the sidewalk, even though one of them may have perceived he was intoxicated. The trooper said Mr. Wagner "walked" or "traveled," while the deputy said he "staggered," yet neither officer thought Mr. Wagner was so impaired he could not successfully negotiate the sidewalk or safely cross the street. Even after the officers heard Mr. Wagner yell something toward them – the trooper hearing obscenities, the deputy hearing him ask if everything was alright – the officers again said they had no facts to support a violation of the law and no reason to stop or arrest Mr. Wagner.

The plaintiff argues that it was only after Mr. Wagner began to run to his home that the officers say they thought something was amiss. The plaintiff's contention is that the officers arrested him solely because he ran to his home in the rain; that running is not a crime; and that, under these circumstances, Mr. Wagner's running could not reasonably be the sole basis for suspecting he engaged in criminal conduct. Even though the officers did not perceive Mr. Wagner as a threat, the arrest was accomplished by pulling Mr. Wagner's right arm from behind while slamming Mr. Wagner against the spindles of his porch with such force that it cut and bruised Mr. Wagner's face and tore the ligaments and tendons in his right elbow. The plaintiff asserts the evidence suggests a guilty conscience by the officers because they later assembled a hodgepodge of unsupportable criminal charges which changed on three different occasions so as to justify their use of force. These charges were all later dismissed.

In sum, the plaintiff asserts that genuine questions of material fact exist as to whether the two officers, through their unwarranted, unreasonable, and unlawful use of

16

excessive force, violated the plaintiff's clearly established right to be free from unlawful arrest, seizure and injury under the West Virginia Constitution.[8] The plaintiff therefore argues that the circuit court correctly denied the defendants' motion for summary judgment, and correctly declined to afford them qualified immunity as a matter of law.

After careful review of the record, and as we discuss below, we agree with the plaintiff's position that a jury question has been presented relating to qualified immunity.

A. *Qualified Immunity*

Qualified immunity is an immunity afforded to government agencies, officials, and/or employees for discretionary activities performed in an official capacity. As we summarized in the Syllabus to *Bennett v. Coffman*, 178 W.Va. 500, 361 S.E.2d 465 (1987), "Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established

---

[8] The plaintiff cites to five different provisions in Article III of the West Virginia Constitution to support his case: § 1 ("All men are, by nature, equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity, namely: The enjoyment of life and liberty, with the means of acquiring and possessing property, and of pursuing and obtaining happiness and safety."); § 3 ("Government is instituted for the common benefit, protection and security of the people, nation or community. . . ."); § 6 ("The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated. . . ."); § 7 ("No law abridging the freedom of speech, or of the press, shall be passed; . . ."); and § 10 ("No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers.").

statutory or constitutional rights of which a reasonable person would have known. A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." *See also* Syllabus, in part, *State v. Chase Sec., Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992) ("A public executive official who is acting within the scope of his authority . . . is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known.").[9] A public officer is entitled to qualified immunity for discretionary acts, even if committed negligently. As we said in Syllabus Points 4 and 6 of *Clark v. Dunn*, 195 W.Va. 272, 465 S.E.2d 374 (1995):

> 4. If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.
>
> . . . .
>
> 6. In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W.Va.Code § 29–12A–1, *et seq.*, and against an officer of that department acting within the

---

[9] In *Chase Securities*, this Court found the *Bennett* holding to be overbroad, and stated that the holding of *Bennett* applied only to qualified immunity and not absolute immunity. 188 W.Va. at 361–62 n. 14, 424 S.E.2d at 596–97 n. 14.

18

scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer.

Under West Virginia law, qualified immunity is more than a defense to liability because, in many cases, it confers upon governmental bodies and public officials the right not to be subject to the burden of trial at all. The very heart of qualified immunity is that it spares the defendant from having to go forward with an inquiry into the merits of the case. Unless expressly limited by statute, qualified immunity is necessarily broad and protects "all but the plainly incompetent or those who knowingly violate the law." *Hutchison*, 198 W.Va. at 148, 479 S.E.2d at 658 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Likewise, "[t]here is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive." Syllabus, in part, *State v. Chase Sec., Inc.*, 188 W.Va. at 357, 424 S.E.2d at 592.

The policy considerations driving the qualified immunity doctrine are straightforward: "public servants exercising their official discretion in the discharge of their duties cannot live in constant fear of lawsuits, with the concomitant costs to the public servant and society." *Hutchison*, 198 W.Va. at 148, 479 S.E.2d at 658. Such fear stymies the work of state government, and will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2nd Cir. 1949). The doctrine "is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *W.Va. Reg'l Jail & Corr.*

*Facility Auth. v. A.B.*, 234 W.Va. 492, 507, 766 S.E.2d 751, 766 (2014) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)).

Qualified immunity strikes a balance between two competing interests: the "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The purpose of qualified and statutory immunity is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow*, 457 U.S. at 818.

A litigant may pierce the shield of qualified immunity by showing that a government official has violated a clearly established statutory or constitutional right. "[Q]ualified immunity . . . is not an impenetrable shield that requires toleration of all manner of constitutional and statutory violations by public officials. Indeed, the only realistic avenue for vindication of statutory and constitutional guarantees when public servants abuse their offices is an action for damages." *Hutchison*, 198 W.Va. at 148, 479 S.E.2d at 658.

The test for evaluating if a public official is entitled to qualified immunity, in the absence of fraudulent, malicious or intentional wrongdoing, is this: would an objectively reasonable public official, acting from the perspective of the defendant, have reasonably believed that his or her conduct violated the plaintiff's clear statutory or constitutional rights? Stated another way:

Therefore, in the absence of any wilful or intentional wrongdoing, to establish whether public officials are entitled to qualified immunity, we ask whether an objectively reasonable official, situated similarly to the defendant, could have believed that his conduct did not violate the plaintiff's constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the allegedly wrongful conduct?

*Id.*, 198 W.Va. at 149, 479 S.E.2d at 659 (footnotes omitted).

Justice Cleckley, writing for the Court in *Hutchison*, suggested a two-part test that determines, first, whether the government officer violated a plaintiff's statutory or constitutional right, and if so, then second, whether that right was clearly established in light of the specific context of the case at the time of the events in question. As Justice Cleckley stated, "When broken down, it can be said that we follow a two-part test: (1) does the alleged conduct set out a constitutional or statutory violation, and (2) were the constitutional standards clearly established at the time in question?" *Id.*, 198 W.Va. at 149, 479 S.E.2d at 659 (footnotes omitted). Several years after *Hutchison*, the United States Supreme Court adopted a similar two-part approach to qualified immunity:

A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . .

If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it

21

> too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

*Saucier v. Katz*, 533 U.S. 194, 201 (2001). This approach need not be rigidly applied. While the *Saucier* two-step protocol is beneficial and "often, but not always, advantageous," trial judges are in the best position to determine (in the fair exercise of their discretion) the order in which these two factors should be considered "that will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan*, 555 U.S. at 242.

Finally, there is one other guiding concept in assessing if a public agency or official is entitled to qualified immunity. Both state and federal law leave "no question that the subjective motivations of a police officer are immaterial to a determination of whether qualified immunity exists in connection with allegations of unreasonable search and seizure, unlawful detention, and excessive force." *Robinson*, 223 W.Va. at 834, 679 S.E.2d at 666 (2009). *See also*, *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015) ("a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable"); *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation").

We now apply this two-step test to the evidence of record.

(1) *Was a constitutional or statutory right violated by the government officer?*

In the first step, we consider whether Deputy Maston and Trooper Curran could be found to have violated a constitutional or statutory right belonging to Mr. Wagner. As we recently said in Syllabus Point 11 of *A.B*:

> To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive . . . In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.

234 W.Va. at 497, 766 S.E.2d at 756.

The plaintiff, Mr. Wagner, asserts that the officers violated his constitutional rights. Mr. Wagner argues that the material facts, viewed in the light most favorable to him as the non-moving party, can reasonably be interpreted as showing the officers objectively and unreasonably violated his rights to be free from unlawful arrest, seizure and injury from excessive force.

Deputy Maston and Trooper Curran, however, assert that the evidence of record unequivocally and indisputably shows that the officers had a reasonable, articulable suspicion of criminal mischief, sufficient to validate their stop of Mr. Wagner. Further, they assert they followed standard arrest procedures, as they were trained to do, and suggest that any injury to Mr. Wagner was the result of his resisting arrest. The officers contend that the favorable report of a State Police supervisor, made at the

hospital on the night of Mr. Wagner's arrest and finding that the officers' use of force followed department guidelines, establishes that the officers are entitled to qualified immunity.

Our reading of the record suggests many factual anomalies that support the circuit court's decision to deny summary judgment on the qualified immunity question. We see numerous factual conflicts in the evidence not only between the plaintiff's witnesses and the defendants' witnesses, but also between the evidence proffered by the two defendant officers and between each officer's own contemporaneous written report(s) and his subsequent deposition testimony.

Additionally, plaintiff Wagner argues that the officers stopped and arrested him even though an objectively reasonable officer would have known it was unlawful, because the facts within the knowledge of the officers did not support the criminal charges alleged. It is axiomatic that, for an arrest to be lawful, the constitution requires that it be supported by probable cause. Under our law, "[p]robable cause to make an arrest without a warrant exists when the facts and the circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed or is being committed." *State v. Plantz*, 155 W.Va. 24, 24, 180 S.E.2d 614, 616 (1971). *See also Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979) ("This Court repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances

24

shown, that the suspect has committed, is committing, or is about to commit an offense.").

However, the plaintiff's expert witness, R. Paul McCauley, Ph.D., testified that the officers' own written reports (as well as the criminal complaint) failed to identify the motivating cause for the arrest, and further failed to identify the factual elements to support the criminal charges they later filed. For example, the plaintiff asserts that – *before his arrest* – the officers had no objective, reasonable evidence to support probable cause to arrest him for public intoxication. To begin, Deputy Maston and Trooper Curran repeatedly stated in their depositions that they had no intention to stop or arrest Mr. Wagner while he was walking down the sidewalk from the bar. Only one officer noted in his written report, prepared immediately after the arrest, a critical element of the offense: that Mr. Wagner was "staggering" down the sidewalk. Trooper Curran's report indicated the plaintiff was walking, and his statement of facts supporting the criminal complaint said he was "traveling." Only after this lawsuit was filed did Trooper Curran testify that the plaintiff was staggering. Still, both officers agreed Mr. Wagner stopped at the intersection to look for traffic before crossing the street, spoke to the officers without slurring his words, and was able to jog or run. When Mr. Wagner yelled toward the cruiser, the trooper told Mr. Wagner to go home. As the plaintiff's expert testified,

> . . . Well, from the time – up until the time the trooper said go home, they didn't have reasonable suspicion to stop [Mr. Wagner] or they would have. After that the issue becomes, according to – I think the deputy, said that Mr. Wagner began to run and at that point they wanted to detain him. As I said before, *I know of no place where running is against the law.*

25

(Emphasis added). Succinctly stated, the officers subjectively admitted their only reason for stopping Mr. Wagner was that he ran. After Mr. Wagner was detained and injured, the two officers noted his red eyes and the smell of alcoholic beverages – yet, the officers did not inform him at that time that he was being arrested and charged with public intoxication.[10]

Another example is found in the charge against Mr. Wagner for disturbing the peace. The plaintiff argues the officers plainly had no probable cause to arrest him for that offense. *West Virginia Code* § 61-6-1b(a) [2002] provided (in part, with emphasis added):

> Any person who, in a public place . . . *disturbs the peace of others* by violent, profane, indecent or boisterous conduct or language or by the making of unreasonably loud noise that is intended to cause annoyance or alarm to another person, and who persists in such conduct after being requested to desist by a law-enforcement officer acting in his lawful capacity, is guilty of disorderly conduct . . .[11]

The plaintiff points out that there were no "others" whose peace was disturbed by the interaction between Mr. Wagner and the officers. The officers identified no people who were around to hear the interaction and no citizen complained that they were disturbed. Both the plaintiff's and the defendants' experts agreed that for laws concerning disturbing

---

[10] *West Virginia Code* § 60-6-9(a)(1) [1999] provided: "A person shall not: (1) Appear in a public place in an intoxicated condition[.]" The statute was amended in 2015 to, among other things, change the phrase "shall not" to "may not."

[11] *West Virginia Code* § 61-6-1b was amended by the Legislature in 2015. No changes were made affecting this appeal.

26

the peace, the term "others" does not include law enforcement officers.[12]  *See generally*,

*City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987).[13]

---

[12] The plaintiff's expert, Dr. McCauley, testified:

> [W]hen we're talking about disorderly and the disturbance to the public or to the community, it basically excludes policemen.  So . . . if somebody is swearing at a policeman and acting in a boisterous fashion to offend the dignity of a policeman, that is usually not grounds for a disorderly conduct.

Similarly, the defendants' expert, Samuel D. Faulkner, testified:

> Q.  . . . I think you said you can swear at an officer as long as you're not physically threatening them.
>
> A.  Yes, sir.  As long as other people aren't there to be offended by that.
>
> Q.  Would you agree that police are not considered the public for the purposes of a disorderly conduct?
>
> A.  I think that's correct.

*But see France v. Southern Equip. Co.*, 225 W.Va. 1, 689 S.E.2d 1 (2010) (it is role of trial judge, and not the parties' experts, to determine, interpret and apply the law applicable to a case).

[13] The plaintiff's counsel makes two additional arguments suggesting that the defendant officers may have had no probable cause to arrest Mr. Wagner for fleeing on foot or for obstructing an officer.

Counsel argues that the crime of fleeing on foot, *West Virginia Code* § 61-5-17(d) [2001] required a person to "intentionally flee" a law enforcement officer "who is attempting to make a lawful arrest[.]"  The officers admitted they only chased Mr. Wagner because he ran, not because they were attempting a lawful arrest for any specific offense.  As Trooper Curran said, "Innocent people don't run," but otherwise said he had no idea why Mr. Wagner was running.

(continued . . .)

In sum, a jury could fairly conclude that an objectively reasonable law enforcement officer, situated similarly to the defendant officers, would have believed that he or she had no probable cause to arrest the plaintiff. Hence, that same officer would have believed that any arrest of the plaintiff would violate the plaintiff's constitutional rights to the enjoyment of life and liberty, to be secure against unreasonable searches and seizures, or to exercise freedom of speech without abridgement.

Likewise, a jury could fairly conclude that the defendants used constitutionally excessive force, because an objectively reasonable law enforcement officer under similar circumstances would not have used the same type or degree of force as that used by the defendants toward the plaintiff. The determination of reasonableness or excessive force in the context of arrests or investigatory stops "is not capable of precise definition or mechanical application." *State v. Lacy*, 196 W.Va. 104, 117, 468 S.E.2d 719, 732 (1996) (quoting *Graham*, 490 U.S. at 396). There are no per se rules in the constitutional excessive force context; rather, courts "must still slosh [their] way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007).

---

Plaintiff's counsel also points out that the officers made no mention of a charge for obstruction in their written reports. It was only after Mr. Wagner was interviewed by a supervising trooper at the hospital that the officers decided to charge him. The plaintiff's expert construed the situation as "a cover your ass charge, a CYA and it says if you hurt somebody during an arrest process, cover your ass and make sure you have a reasonable charge that would justify the use of force." Further, the charge was irrelevant to the issue of why the officers stopped and arrested Mr. Wagner in the first place. The plaintiff contends it can reasonably be construed as an attempt by the officers to justify their injuries to the plaintiff.

28

An objective reasonableness standard is used to assess whether an officer's actions are excessive, that is, "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *City of Saint Albans v. Botkins*, 228 W.Va. 393, 399 n.16, 719 S.E.2d 863, 869 n.16 (2011) (quoting *Graham,* 490 U.S. at 397).

The proper application of the objective reasonableness standard in an excessive force case "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The United States Supreme Court recently offered a more extensive list of things to consider when weighing the objective reasonableness of an officer's actions, emphasizing that the list was not exclusive:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. We do not consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force.

*Kingsley*, 135 S.Ct. at 2473 (citation omitted).

The defendants assert that the officers' actions when they arrested plaintiff Wagner were reasonable and not excessive. The defendants contend that the plaintiff

resisted the officers' attempts to handcuff him, and that the officers used a wristlock which was taught to them at the State Police Academy in order to effectively pull the plaintiff's hands behind his back. The defendants' expert testified that a properly executed wristlock wouldn't have harmed the plaintiff, and that any injury is usually the result of how a person resists the technique.

However, viewed in a light most favorable to the plaintiff, a reasonable fact-finder could conclude that the officers' use of force was unreasonable and excessive. First, we have given careful attention to the facts and circumstances of this case, particularly the severity of the crimes allegedly at issue. The officers admitted that they only stopped Mr. Wagner because he ran (and, as they believed, innocent people do not run). However, presuming the officers legitimately sought to stop him for the later-charged offenses of public intoxication and disturbing the peace, a reasonable jury could construe Deputy Maston's act of slamming Mr. Wagner's face into a porch while simultaneously yanking Mr. Wagner's arm behind his back as excessive. Mr. Wagner's facial injuries and injured arm incurred for simply running toward his home in the rain may be perceived by a jury as severe in light of his perceived offenses. Admittedly, the officers tempered their use of force as soon as the plaintiff was handcuffed, and even moved his handcuffs to his front when they promptly transported him to the hospital. However, these reasonableness elements are better evaluated by the jury.

Moreover, both officers recognized Mr. Wagner, knew him to be a respectable and generally harmless citizen, saw that he was not brandishing any weapons, and saw that he posed no immediate threat to the safety of the officers or others. When

30

the officers began pursuing him down the street, Trooper Curran neglected to activate his flashing lights, which would have automatically activated the cruiser's audio and video recording system. The trooper also did not manually activate the recording system. As the plaintiff notes, State Police policies require a trooper to use the recording system, and says it "shall remain activated from the time that a member initiates contact with a traffic violator or other offender/suspect."[14] A jury could find that the failure to use the audiovisual recording system further suggests that the officers did not perceive Mr. Wagner as a threat.

Finally, whether Mr. Wagner was resisting arrest or attempting to evade arrest by fleeing on foot presumes both that Mr. Wagner was aware he had committed a criminal act and that he knew that he was being pursued by the officers. The officers contend they told Mr. Wagner to stay where he was, and when he ran they pursued him, again telling him to stop. The evidence, however, equally suggests it was raining such that the parties had to yell to be heard, and even still had difficulty communicating.

Examining the totality of the circumstances, and viewing the evidence in the light most favorable to the non-moving party, a reasonable fact-finder could conclude that the officers' use of force was unreasonable and therefore constitutionally excessive.

---

[14] The policy is contained in *West Virginia State Police Policy 17: In-Car Audiovisual Recording Equipment.*

(2) *Was the constitutional or statutory right "clearly established"*

In the second step, we consider whether the constitutional standards Deputy Maston and Trooper Curran are alleged to have violated were clearly established at the time of Mr. Wagner's arrest. This second standard is intended to protect law enforcement officers from liability for "bad guesses in gray areas" and ensures they will be held liable only for violating bright-line rules. *City of Saint Albans v. Botkins*, 228 W.Va. at 402, 719 S.E.2d at 872 (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) ("qualified immunity should serve to shield law enforcement officers from 'bad guesses in gray areas; they are liable for transgressing bright lines.'")).

The defendants argue that even if the officers *did* violate some constitutional or statutory right belonging to the plaintiff, the officers did not violate any "clearly established" right. They assert that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396. As support for their argument, the defendants cite to a qualified immunity case where we found no constitutional violation occurred when a police officer kneed the plaintiff in the back and struck him in the head with the butt of his drawn gun. *See City of Saint Albans v. Botkins*, 228 W.Va. at 396, 719 S.E.2d at 866. The defendants seem to suggest that since Deputy Maston and Trooper Curran acted with more restraint than the officer in *City of Saint Albans*, they could not have understood their actions were unreasonable and they are, therefore, automatically entitled to immunity.

32

The *City of Saint Albans* case is easily distinguishable from this case. The case began with a heated confrontation between two groups of young men, six men total, shouting and cursing at one another at 3:00 a.m. in a restaurant parking lot. Two of the men were carrying objects (a flashlight and a wooden club), and a seventh man was running toward the scene. The two officers who arrived on the scene quickly ordered the men to get down on the ground, but the plaintiff failed to fully comply prompting one officer to aggressively subdue the plaintiff. *Id.* In this situation, the Court determined the officers acted reasonably and were entitled to qualified immunity because, acting quickly, the officers perceived that the young men – two of whom were armed – posed a threat to each other, to the officers, and to others in the restaurant. *Id.*, 228 W.Va. at 402, 719 S.E.2d at 872.

In the context of excessive force cases, the constitutional standard – reasonableness – is always an exceptionally fact-specific inquiry. Hence, there are two ways to show a government official's actions are unreasonable. "A violation [of a constitutional right] may be clearly established if the violation is so obvious that a reasonable state actor would know that what they are doing violates the Constitution, *or* if a closely analogous case establishes that the conduct is unconstitutional." *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001) (emphasis added). When the conduct of a government official "'is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994)

33

(quoting *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir. 1993)). "If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011). "Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001). *See also*, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (rejecting the notion that officer liability cannot exist "unless the very action in question has previously been held unlawful").

We perceive nothing novel about the facts of the instant case, and the United States Supreme Court has made "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "That the level of force used must be justified in light of 'the severity of the crime at issue,' the suspect's flight risk, and the immediacy of the risk posed by the suspect to the safety of officers and others was the clearly established law on the night of the incident." *Shekleton v. Eichenberger*, 677 F.3d 361, 367 (8th Cir. 2012) (quoting *Graham*, 490 U.S. at 396).

Trial courts must, of course, allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. But, of course, "a simple statement by an officer that he

34

fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281.

In this case, Deputy Maston and Trooper Curran admit they knew the plaintiff, saw that he was not brandishing a weapon, knew he had nothing in his hands, and saw he was alone. The officers knew the plaintiff, his sister and his brother, and knew the plaintiff was an older, established citizen in the community and not a likely flight risk. Significantly, the officers admit they were never in fear of danger. Further, the officers' own written reports and statements suggest insufficient evidence to show they had probable cause to think an actual crime had been committed.

Viewed objectively, there was no tense, uncertain or rapidly-evolving situation requiring a split-second judgment by the officers. A jury could, on this record, find that the level of force by the defendant officers was not justified by the crimes alleged, by the plaintiff's flight risk, or by the risk to the safety of the officers or others. A jury could therefore conclude that the defendant officers exercised their power irresponsibly and unreasonably, and violated the plaintiff's clear constitutional rights to be free of unlawful seizure, unlawful arrest, and injury from excessive force.

Accordingly, we find no error in the circuit court's decision to deny qualified immunity to Deputy Maston and Trooper Curran.

## B. *Liability of the officers' employers*

The West Virginia State Police and the Tyler County Sheriff's Department appeal the circuit court's summary judgment order, and assert that they are entitled to qualified immunity separately from Trooper Curran and Deputy Maston.

The circuit court properly rejected this qualified immunity argument. The State Police is not entitled to qualified immunity because that state agency may be vicariously liable for the wrongful acts of a trooper committed within the scope of the trooper's employment. "If the plaintiff identifies a clearly established right or law which has been violated by the acts or omissions of the State, its agencies, officials, or employees, or can otherwise identify fraudulent, malicious, or oppressive acts committed by such official or employee," and "[i]f the public official or employee was acting within the scope of his duties, authority, and/or employment," then "the State and/or its agencies may be held liable for such acts or omissions under the doctrine of *respondeat superior* along with the public official or employee." Syllabus Point 12, in part, *A.B.*, 234 W.Va. at 766 S.E.2d at 756. Further, the Tyler County Sheriff's Department is not entitled to immunity because, under the Governmental Tort Claims and Insurance Reform Act, a political subdivision (such as a county sheriff) is statutorily liable for damages "caused by the negligent performance of acts by their employees while acting within the scope of employment." *W.Va. Code* § 29-12A-4(b)(1), (c)(2) [1986].

On appeal, the two government agencies argue for the first time that claims of improper training, retention and supervision of the officers are purely discretionary activities that are subject to qualified immunity. They base their argument on an opinion

36

issued by this Court on October 31, 2014, just over a month after entry of the circuit court's order. Although this argument was not raised in the trial court, we will afford the argument brief consideration.

The case forming the basis for the defendant employers' argument is *West Virginia Regional Jail and Correctional Facility Authority v. A.B.*, 234 W.Va. 492, 766 S.E.2d 751 (2014). In that case, we noted "that the broad categories of training, supervision, and employee retention . . . easily fall within the category of 'discretionary' governmental functions." *Id.*, 234 W.Va. at 514, 766 S.E.2d at 773. Furthermore, we reaffirmed the principle that (in the absence of an insurance contract waiving the defense) government officers cannot be held liable for mere negligence in the making of a discretionary act or omission. 234 W.Va. at 504-05, 766 S.E.2d at 763-64 (quoting Syllabus Points 4 and 6 of *Clark v. Dunn*, 195 W.Va. at 273, 465 S.E.2d at 375).

We went on to say, however, that "the conclusion that employee training, supervision, and retention are discretionary governmental functions is not necessarily fatal" to a plaintiff's claim. 234 W.Va. at 515, 766 S.E.2d at 774. Instead, if the plaintiff can identify a violation of an established constitutional right or law with respect to an agency's training, supervision, or retention policies, then the agency is not entitled to qualified immunity.

As we have previously discussed, the record details numerous significant questions of material fact concerning whether the officers violated clearly established constitutional rights. Further, the record also suggests that the deliberate or reckless policies and actions of both the State Police and the Tyler County Sheriff's Department

may have caused or contributed to the violations of these established rights. On this record, we find no error in the circuit court's decision to deny qualified immunity to the State Police or the Tyler County Sheriff's Department.[15]

## IV.
## CONCLUSION

The circuit court's September 25, 2014, order properly denied summary judgment on the ground of qualified immunity because there are genuine issues of material fact underlying the immunity determination. The order is therefore affirmed.

Affirmed.

---

[15] Deputy Maston asserts one additional argument that was briefed below but not considered by the circuit court. He argues that the plaintiff's claims against him are barred by the Governmental Tort Claims and Insurance Reform Act, unless it is proven that his actions were "manifestly outside the scope of employment or official responsibilities," or "were with malicious purpose, in bad faith, or in a wanton or reckless manner." *W.Va. Code* § 29-12A-5(b)(1)-(3) [1986]. As these are questions for the fact-finder, we decline to consider this argument.