# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Spring 2024 Term

_____

No. 22-ICA-163

_____

**FILED**

**April 15, 2024**

released at 3:00 p.m.
ASHLEY N. DEEM, DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

HANK HECKMAN and LOREN GARCIA,
Plaintiffs Below, Petitioners,

v.

BETSY JIVIDEN, JEFF SANDY, and PATRICK MORRISEY,
Defendants Below, Respondents.

_____

Appeal from the Circuit Court of Kanawha County
Honorable Tera Salango, Judge
Civil Action Nos. 21-C-903 and 21-C-904

AFFIRMED

_____

Submitted:  January 10, 2024
Filed:  April 15, 2024

Jeremy B. Cooper, Esq.
Blackwater Law PLLC
Aspinwall, Pennsylvania
Counsel for Petitioners

Johnnie E. Brown, Esq.
James A. Muldoon, Esq.
Pullin, Fowler, Flanagan, Brown &
Poe, PLLC
Charleston, West Virginia
Counsel for Respondent Morrisey

William E. Murray, Esq.
Bailey & Wyant, PLLC
Charleston, West Virginia
Counsel for Respondents Jividen and
Sandy

CHIEF JUDGE SCARR delivered the Opinion of the Court.

SCARR, CHIEF JUDGE:

Petitioners, Hank Heckman and Loren Garcia, appeal the Orders granting the Respondents' motions to dismiss entered by the Circuit Court of Kanawha County on September 14, 2022. Petitioners brought various claims against the Respondents in their individual and official capacities for their involvement in the creation and implementation of a West Virginia Department of Corrections and Rehabilitation policy that changed the good time and parole eligibility for those reincarcerated after the revocation of their supervised release. The implementation of the new policy led to the rearrest and reincarceration of individuals who had already been released on parole, including the Petitioners. After the Petitioners' release pursuant to *State ex rel. Phalen v. Roberts*, 245 W. Va. 311, 858 S.E.2d 936 (2021), they brought suit, seeking damages, injunctive relief, and declaratory judgment for various tort and constitutional claims. The circuit court found that the Respondents were entitled to absolute, qualified, and statutory immunity from liability regarding their involvement with the creation and implementation of the policy. The circuit court also concluded that the Respondents were not "persons" under 42 U.S.C. § 1983, that the Petitioners had failed to state a claim for a taking and for money damages, and that Respondent Morrisey's office was entitled to sovereign immunity.

Having reviewed the parties' arguments, the record on appeal, and the controlling law, we affirm the circuit court's September 14, 2022, dismissal orders. We affirm for the reasons discussed below, on the basis of the Respondents' immunity from liability regarding the creation and implementation of the policy.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Hank Heckman was indicted in Taylor County, West Virginia, in 2010 for sexual offenses, and was subsequently committed as a youthful offender pursuant to a plea agreement. Following Mr. Heckman's commitment as a youthful offender, he was placed on three years of supervised probation and ten years of extended supervised release. Mr. Heckman violated his supervised probation and was reincarcerated until he completed his term of supervised probation. Once released, Mr. Heckman began his ten-year term of supervised release. Mr. Heckman's supervised release was subsequently revoked, and on July 20, 2017, he was ordered to serve all ten years of his supervised release in prison. On June 11, 2020, Mr. Heckman was released on parole after serving one fourth of his ten-year sentence.

Petitioner Loren Garcia was indicted in Randolph County, West Virginia, in 2013 for child abuse offenses. Ms. Garcia pleaded guilty and was sentenced to an indeterminate term of not less than one nor more than three years in prison followed by ten years of extended supervised release. After Ms. Garcia was released from prison and placed on supervised release, she was indicted for First Degree Robbery in Harrison County, for which she pleaded guilty and was sentenced to a determinate term of ten years in prison. As a result, Ms. Garcia's supervised release in Randolph County was revoked and she was ordered to serve three years of her ten-year supervised release term in prison, to run consecutively to the prison term imposed in Harrison County, with an additional thirty-

2

year period of supervised release to begin upon her release. Ms. Garcia began serving her prison terms for the Harrison County case and the revocation of her Randolph County supervised release on April 12, 2016. On December 5, 2019, Ms. Garcia was released on parole after serving more than one fourth of her thirteen-year term. Both Petitioners were released on parole after only serving a portion of the prison terms imposed after the revocation of their supervised release due to the accumulation of good time pursuant to West Virginia Code § 62-12-13 (2021) and West Virginia Code § 15A-4-17 (2021).

Following the onset of the Covid-19 pandemic, certain inmates in the custody of the Department of Corrections and Rehabilitation ("DOCR") were awarded good time credit for their efforts in making masks and cleaning to help mitigate the spread of Covid-19 in DOCR facilities. As part of the DOCR's review of these inmates' timesheets for the award of good time, someone at the DOCR determined that certain inmates selected to receive good time were ineligible for good time. As a result, on August 7, 2020, Respondent Betsy Jividen, the DOCR Commissioner, put the good time award program under review. At the time of this review, DOCR Policy Directive 151.02 governed good time eligibility. It did not limit good time eligibility for persons whose supervised release had been revoked, such as the Petitioners, who had already been released by this time. In October of 2020, the DOCR adopted a new policy that made persons whose supervised release had been revoked ineligible for parole and good time credit. As a result, on November 23, 2020, Policy Directive 151.06, which removed good time eligibility for persons whose supervised release had been revoked, was implemented. No formal

administrative rule regarding parole eligibility was issued, as Policy Directive 151.06 was an internal DOCR policy.

On December 7, 2020, Respondent Jividen signed a series of arrest warrants for those individuals who had previously had their supervised release revoked but were subsequently released on parole based on good time credit. The reason alleged for the arrests was "clerical error or mistake." Two of these warrants were for Mr. Heckman and Ms. Garcia, and another was for an individual named Scott Phalen. There were no allegations that they had violated the terms of their parole. Soon after the issuance of these warrants, Mr. Heckman, Ms. Garcia, and Mr. Phalen were arrested and reincarcerated.

On December 22, 2020, Ms. Garcia filed an original jurisdiction habeas action in the Supreme Court of Appeals of West Virginia ("SCAWV") predicated on the theory that regardless of whether the DOCR policy changes were valid, such changes could not be retroactively applied to persons whose crimes occurred before the policy change took place on *ex post facto* principles. On December 23, 2020, Mr. Phalen filed a similar original jurisdiction habeas with the SCAWV which was consolidated with Ms. Garcia's. The matter was set for oral argument to be held on April 14, 2021.

On March 25, 2021, SB 713 was introduced in the West Virginia Senate, which codified the DOCR's policy change regarding the ineligibility of good time for persons whose supervised release had been revoked but restored the good time that was

4

previously taken from persons revoked from supervised release up to October 21, 2020. SB 713 also provided absolute immunity to the DOCR and its agents for reincarcerating individuals based on the change in good time policy. SB 713 was signed into law by the Governor on April 19, 2021, with an effective date of April 30, 2021, amending West Virginia Code § 15A-4-17.

On April 13, 2021, the day before oral argument in the SCAWV, the DOCR preemptively recalculated Ms. Garcia's good time based on SB 713 and determined that she had sufficient good time to discharge her three-year sentence and be parole eligible for her ten-year sentence. Ms. Garcia was released that same day, and thus her habeas petition was dismissed as moot. On April 27, 2021, Mr. Heckman filed an original jurisdiction habeas with the SCAWV on the same basis as the habeas petitions filed by Ms. Garcia and Scott Phalen. On June 16, 2021, the SCAWV issued its decision in *State ex rel. Phalen v. Roberts*, 245 W. Va. 311, 858 S.E.2d 936 (2021), holding that persons who had their supervised release revoked remained parole eligible, and that the DOCR was not permitted to reduce eligibility for good time for persons who had their supervised release revoked when their underlying crimes were committed prior to the effective date of SB 713, due to *ex post facto* principles. As a result of *Phalen*, Mr. Heckman was released on parole on June 24, 2021, and his habeas petition was thus dismissed as moot.

5

On October 8, 2021, Mr. Heckman and Ms. Garcia, both individually and on behalf of a class of persons similarly situated, filed this civil action. Their Complaint asserted the following claims and relief:

- a declaration that the absolute immunity provision of SB 713 (codified as W. Va. Code § 15A-4-17(p)) is unconstitutional;
- an injunction preventing the Respondents from relying on the absolute immunity provision in litigation;
- "Civil RICO" pursuant to 18 U.S. §1961-1968 for the Respondents' alleged enterprise formed to advance Governor Justice's political interests by changing the good time and parole eligibility policies to prevent any perception of leniency to sex offenders;
- assault and battery for the effectuation of the unlawful arrests;
- false imprisonment;
- abuse of process for issuing the warrants for arrest for nonexistent clerical error or mistake;
- malicious prosecution;
- violation of the Eighth Amendment of the U.S. Constitution for detaining people beyond the termination of their sentences;
- violation of the Fourth Amendment of the U.S. Constitution for the unlawful seizure;
- violation of the Fifth and Fourteenth Amendments to the U.S. Constitution for failing to provide Heckman and Garcia any due process before reincarcerating them;
- violation of the *Ex Post Facto* clause of the U.S. Constitution;
- an unlawful taking under the West Virginia Constitution for depriving Heckman and Garcia of their right to earn an income;
- damages pursuant to W. Va. Code § 55-7-9, which authorizes a cause of action for damages sustained for violation of a statute, for Respondents' violation of W. Va. Code § 62-12-13(b)(1)(A) and W. Va. Code § 15A-4-17(a); and
- civil conspiracy for the Respondents' concerted action and common plan to commit the torts outlined in the complaint.

6

After the Complaint was filed, Respondents Jividen and Sandy filed a joint motion to dismiss, and Respondent Morrisey and the Attorney General's office filed their own motion to dismiss. These motions raised several defenses, including sovereign immunity, absolute prosecutorial immunity, absolute immunity related to administrative rule-making functions, absolute statutory immunity stemming from West Virginia Code § 15A-4-17(p), and qualified immunity. On August 31, 2022, the circuit court held oral argument regarding these motions.

On September 14, 2022, the circuit court entered orders granting the Respondents' motions to dismiss. Regarding Respondents Jividen and Sandy, the circuit court concluded that they were entitled to absolute immunity pursuant § 15A-4-17(p); that they are agents of the State, therefore they are not "persons" under 42 U.S.C. §1983 and no *respondeat superior* liability exists under 42 U.S.C. § 1983; that Petitioners failed to state a claim for a taking under the West Virginia Constitution because they did not assert that property was taken; that there is no independent cause of action for money damages pursuant to the West Virginia Constitution; that Respondents Jividen and Sandy are entitled to qualified immunity because they did not violate a clearly established right because *Phalen* had not been decided before the Petitioners were reincarcerated; and that Respondents Jividen and Sandy were entitled to absolute immunity because their actions stem from administrative policy-making.

Regarding Respondent Morrisey and the Attorney General's Office, the circuit court concluded that they were entitled to absolute immunity for performing statutory prosecutorial duties; that they were not a "person" under 42 U.S.C. §1983; that they were entitled to sovereign immunity since the Complaint did not allege that recovery was sought under the limits of the State's liability insurance policy; and they were entitled to qualified immunity because making legal arguments on behalf of the State is a discretionary function and his arguments did not violate the Rules of Professional Responsibility. This appeal followed.[1]

## II. STANDARD OF REVIEW

Our standard of review is well settled. "A circuit court's decision that a complaint fails to state a claim on which relief can be granted is a ruling of law, and we review such a decision de novo." *See* Syl. Pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995).

> The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.

Syl. Pt. 1, *Hutchison v. City of Huntington*, 198 W. Va. 139, 479 S.E.2d 649 (1996). With this plenary standard in mind, we address the parties' arguments.

---

[1] This Court held oral argument on January 10, 2024.

8

## III.  DISCUSSION

The issue facing this Court is to determine what immunity, if any, to which the Respondents are entitled. The State enjoys, with some exceptions, a near-absolute degree of protection from lawsuit or liability, recognized as sovereign immunity. *See* W. Va. Const. art. VI, § 35; *Pittsburgh Elevator Co. v. W. Virginia Bd. of Regents*, 172 W. Va. 743, 749–57, 310 S.E.2d 675, 681–89 (1983). Additionally, the employees, officials, and agents of the State ("public officials") enjoy different but related immunities that shield them from liability for much of the conduct that they undertake in service to the State. *See W. Virginia Bd. of Educ. v. Marple*, 236 W. Va. 654, 661, 783 S.E.2d 75, 82 (2015). Although related, sovereign immunity and the immunities enjoyed by public officials differ in their scope and purpose. *Id.* Sovereign immunity is greater in scope, as it is intended to protect the public purse. The immunities of a public official often confer a lesser degree of protection, as their purpose is not to preserve the public official from damages, but to allow them to perform their duties freely. *See id.* A public official can receive either qualified or absolute immunity, depending upon the nature of the act and the nature of their duties. *Parkulo v. W. Virginia Bd. of Prob. & Parole*, 199 W. Va. 161, 176, 483 S.E.2d 507, 522 (1996). Qualified immunity is, intuitively enough, a lesser degree of liability protection than absolute immunity. *See W. Virginia Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 507–08, 766 S.E.2d 751, 766–67 (2014).

9

"Qualified immunity is an immunity afforded to government agencies, officials, and/or employees for discretionary activities performed in an official capacity." *Maston v. Wagner*, 236 W. Va. 488, 499, 781 S.E.2d 936, 947 (2015). Qualified immunity shields public officials performing discretionary functions from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights that the public official should have reasonably known. *Id.*, at 499–500, 781 S.E.2d at 947–48. The scope of protection provided by qualified immunity is meant to strike a balance between the competing societal interests of holding public officials accountable when they exercise power irresponsibly, and shielding them from harassment, distraction, and liability when they perform their duties reasonably. *Id.*, at 500, 781 S.E.2d at 948 (*quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity allows public officials to operate with a freer hand, without fear of vexatious litigation holding them liable for difficult decisions often required to be made by one performing the State's business. "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." Syl. in part, *Bennett v. Coffman*, 178 W. Va. 500, 361 S.E.2d 465 (1987) (overruled on other grounds by *Dale v. Ciccone*, 233 W. Va. 652, 760 S.E.2d 466 (2014)).

The protections granted by qualified immunity protect not only public officials, but society as a whole, as "claims frequently run against the innocent as well as the guilty." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). The societal costs qualified immunity wards against include the expenses of litigation, the diversion of public officials'

energy from their duties, deterring able citizens from seeking public office, and the danger that fear of being sued will discourage the effectual discharge of duty from all but the most resolute or irresponsible of public officials. *Id.* In addition, because the discretionary acts relevant to qualified immunity are necessarily influenced by the decisionmaker's experiences, values, and emotions, there often is no clear end to the relevant evidence. *Id.* at 816. Judicial inquiry into subjective, discretionary acts therefore may entail overly broad discovery, further increasing the burden of such litigation upon both public officials and society. *Id.* at 817.

We find the case *West Virginia Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014), to be instructive to our analysis of a public official's immunity.

> To determine whether the State, its agencies, officials, and/or employees are entitled to immunity, a reviewing court must first identify the nature of the governmental acts or omissions which give rise to the suit for purposes of determining whether such acts or omissions constitute legislative, judicial, executive or administrative policy-making acts or otherwise involve discretionary governmental functions. This critical first step may be evident from the nature of the allegations themselves or may be effectively accomplished by identifying the official or employee whose acts or omissions give rise to the cause of action.

*A.B.*, 234 W. Va. at 507, 766 S.E.2d at 766. If this initial analysis finds that the claims against the public official arise from judicial or legislative acts, or executive

11

or administrative policy-making, the public official is absolutely immune from liability. *Id.*

Next, we must consider whether any claims that survive the first step arise from ministerial or discretionary acts. *See id.* at 508, 766 S.E.2d at 767. "Ministerial acts, by definition, are official acts which, under the law, are so well prescribed, certain, and imperative that nothing is left to the public official's discretion." *State v. Chase Sec., Inc.*, 188 W. Va. 356, 364, 424 S.E.2d 591, 599 (1992). As ministerial acts are so well-defined and proscriptive, they are essentially "clearly established," and thus a public officer would not be entitled to qualified immunity and be liable for "nonperformance or misperformance of such acts." *See id.* In contrast, discretionary functions are those acts performed by a public official which require the use of their discretion, judgements and decisions informed by their knowledge, experience, values and emotions. *See A.B.*, 234 W. Va. at 509, 766 S.E.2d at 768; *Harlow*, 457 U.S. at 816. Upon finding that a public official who was not entitled to absolute immunity was performing discretionary functions, the last step is for the reviewing court to determine whether the plaintiff has shown that the public official violated clearly established and reasonably known statutory or constitutional rights, or was otherwise fraudulent, malicious, or oppressive. *A.B.*, 234 W. Va. at 507, 766 S.E.2d at 766. In absence of such a showing, both the State and its officials are immune from liability. *Id.*

There is only a narrow bandwidth of official conduct that a public official may be held personally liable for under the doctrine of qualified immunity. Because the purpose of qualified immunity is to allow public officials to exercise their official discretion in the discharge of their duties without constant fear of lawsuits, the sweep of qualified immunity is necessarily broad. *Hutchison*, 198 W. Va. at 148, 479 S.E.2d at 658. Qualified immunity's broad protections safeguard from liability all but the plainly incompetent public official or one who knowingly violates the law. *Id.* (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The constitutional or statutory right the plaintiff alleges was violated must have been clearly established, settled law at the time of the act's occurrence. Furthermore, that clearly established, settled law must also have been reasonably known by the public official. This presents serious hurdles for plaintiffs hoping to prevail in lawsuits against public officials for their discretionary acts, as if the public official has a colorable argument for the legality of their conduct, the legal right violated was likely to not be so settled as to be "clearly established."

Given this rule, we now must apply our immunities analysis to the case at hand. The first step in this analysis is to identify whether the public official's acts constitute legislative or judicial acts, or executive or administrative policy-making. Here, we look to the Petitioners' Complaint to analyze the allegations and the public officer's duties.

The Complaint identifies the Respondents, listing their positions within the government of West Virginia. Respondent Jividen is described as the Commissioner for the DOCR. The Complaint describes Respondent Morrisey as the Attorney General, with "authority over the Office of the Attorney General of West Virginia." Respondent Sandy is described as the Cabinet Secretary of the West Virginia Department of Homeland Security ("DHS"). The Complaint also notes that the DOCR is a subpart of the DHS. The Complaint alleges that Respondent Jividen placed the "good time" award program under review, and signed arrest warrants for the Petitioners that caused their rearrest and reincarceration. The Complaint alleges that Respondent Morrisey is "personally responsible" for deciding whether the Office of the Attorney General would defend the DOCR's actions or "alternatively whether his office will confess error," and states that the Office of the Attorney General defended the DOCR's policy and actions at Respondent Morrisey's behest. The Complaint alleges that Respondent Sandy was involved in the decision to place the "good time" program under review and in the drafting of SB 713, and that an "agent" of his testified before the legislature justifying SB 713's codification of the DOCR's policy change.

If the claims against the public official arise from judicial or legislative acts, or executive or administrative policy-making, the public official is entitled to absolute immunity. *A.B.*, 234 W. Va. at 507, 766 S.E.2d at 766. Analyzing the facts and allegations of the Complaint, it is evident that Respondents

14

Morrisey and Sandy are entitled to absolute immunity. Respondent Morrisey is the Attorney General, a public official whose purpose is to serve as the State of West Virginia's chief attorney, and his alleged factual involvement is defending the State in court, the very essence of judicial acts entitled to absolute immunity. Respondent Sandy, the Cabinet Secretary for DHS, is a public official whose role could involve both policy-making and executive decision-making for DHS and the administrative agencies under its authority. However, the Complaint alleges that Respondent Sandy was involved in the DOCR's decision to place the "good time" program under review, which is plainly administrative policy-making. The other alleged acts of Respondent Sandy's are that he was involved in SB 713's drafting, and that his "agent" testified before the legislature about SB 713, clear examples of legislative acts. A public official has absolute immunity for administrative policy-making and legislative acts, so Respondents Morrisey and Sandy are entitled to absolute immunity. Respondent Jividen's placement of the "good time" program under review is administrative policy-making, and thus she is entitled to absolute immunity for any claims arising out of that act. On the other hand, Respondent Jividen's signing of the arrest warrants that caused the Petitioners' reincarceration was not a judicial or legislative act, nor administrative or executive policy-making. The issuance of the warrants and subsequent arrests and reincarcerations were the enactment of the DOCR's new policy, not its formation. Therefore, Respondent Jividen is not entitled to absolute immunity for signing the warrants authorizing the Petitioners' arrests.

15

Having thus segregated the acts for which the Respondents are entitled to absolute immunity, this Court must consider whether Respondent Jividen's issuance of the warrants causing the Petitioners' arrest and reincarceration was ministerial or discretionary. A public official is entitled to qualified immunity for discretionary acts and receives no immunity for ministerial acts. *Id.* at 508, 766 S.E.2d at 767; *Chase Sec., Inc.*, 188 W. Va. at 364, 424 S.E.2d at 599. A ministerial act is one where the public official has no real decision-making, as the act is so proscribed that nothing of substance is left to their discretion. *See Harlow*, 457 U.S. at 816; *Chase Sec., Inc.*, 188 W. Va. at 364, 424 S.E.2d at 599. The record shows no evidence that there was any process that mandated Respondent Jividen's issuance of the arrest warrants, therefore as Commissioner of the DOCR, the issuance of the arrest warrants was within her discretion. Indeed, Respondent Jividen's letter claiming that the DOCR had the authority to rearrest Petitioner Heckman shows that her reasoning, experience, and values informed her decision to issue the warrants, characteristic of a discretionary act.[2] We thus conclude that Respondent Jividen's issuance of the warrants that led to the rearrest and reincarceration of the Petitioners was a discretionary act entitled to qualified immunity.

---

[2] Respondent Jividen's letter was sent to a circuit court judge explaining Petitioner Heckman's rearrest and reincarceration by stating that his original release date was "calculated using day-for-day good time credit" which the DOCR had since determined "is not appropriate for sex offenders serving time for a violation of their supervised release."

16

The last step is to determine whether qualified immunity protects Respondent Jividen from liability arising out of the issuance of the arrest warrants for the Petitioners. To answer this ultimate question, we must determine whether Respondent Jividen violated a clearly established constitutional or statutory right, of which she should have reasonably been aware. It should be noted that we are asking this question at the time of the decisionmaker's act, not the present day. With the hindsight guidance provided by *State ex rel. Phalen v. Roberts*, 245 W. Va. 311, 858 S.E.2d 936 (2021), it has now been clearly established that Respondent Jividen's act violated the Petitioners' legal rights. However, we must ask whether it had been clearly established *at the time of the warrants' issuance* that Respondent Jividen was violating the Petitioners' rights.

The Petitioners argue that at the time of Respondent Jividen's issuance of the warrants, the case *State v. Hargus*, 232 W. Va. 735, 753 S.E.2d 893 (2013) had already clearly established that the issuance violated their legal rights. In *Hargus*, the petitioners were sex offenders who had violated the terms of the supervised release imposed on them pursuant to West Virginia Code § 62-12-26 and had been subsequently reincarcerated after their supervised release's revocation. *Id.* at 739, 753 S.E.2d at 897. The *Hargus* petitioners claimed that their reincarceration violated their due process rights and the double jeopardy clause under the United States and West Virginia Constitutions. *Id.* at 741, 753 S.E.2d at 899. The *Hargus*

petitioners argued that § 62-12-26 violated due process and the double jeopardy clause because a revocation of supervised release and subsequent reimprisonment could be authorized by a circuit court finding a violation by a clear and convincing standard, a lesser standard than what is usually required for criminal punishment, a jury's finding of guilt beyond a reasonable doubt. *Id.* They also argued that § 62-12-26 violated the prohibition against double jeopardy, because "a person sentenced to incarceration for a violation of supervised release is punished twice, once for the original offense and then a second time when his supervised release is revoked and he is sentenced to post-revocation incarceration." *Id.* at 743, 753 S.E.2d at 901. The *Hargus* Court resolved both issues by holding that post-revocation reincarceration is part of the single sentence arising from the original conviction. *Id.* at 742–43, 753 S.E.2d at 900–01.

To understand whether *Hargus* had already "clearly established" the legal rights at issue in *Phalen*, we must consider the issues addressed therein. The petitioner in that case was Scott Phalen, one of the individuals released on parole from post-revocation reincarceration. *Phalen*, 245 W. Va. at 314–15, 858 S.E.2d at 939–40. The DOCR argued that Mr. Phalen was ineligible for parole or good time, despite § 62-12-13(b)'s statutory language that "any inmate" is eligible for parole if they have served one fourth of their sentence, and West Virginia Code § 15A-4-17(a)'s language that "all adult inmates" shall have good time apply to their

18

sentences.[3] *Phalen*, 245 W. Va. at 316–17, 858 S.E.2d at 941–42. *See* W. Va. Code § 62-12-13(b) (2021); *Id.* at § 15A-4-17(a) (2018). The DOCR's argument was that Mr. Phalen's post-revocation reincarceration was not a "sentence" at all, but a "sanction" for violating the terms of his supervised release, and thus inapplicable to the good time or parole statutes. *Phalen*, 245 W. Va. at 316–17, 858 S.E.2d at 941–42. The court rejected the DOCR's argument, stating they had already established in *Hargus* that post-revocation reincarceration is a part of the original sentence, therefore those serving such a term were eligible for good time and parole until the effective date of SB 713. *Id.* at 318, 321, 858 S.E.2d at 943, 946.

The Petitioners' argument that *Hargus* had already clearly established the violation found in *Phalen* is predicated upon the fact that in both *Hargus* and *Phalen* the argument concerned whether reincarceration after the revocation of supervised release pursuant to West Virginia Code § 62-12-26 was a separate punishment from the original sentence. In *Hargus*, the Petitioners' constitutional arguments were predicated upon the view that these were separate punishments, as was the DOCR's argument in *Phalen*.  These arguments were essentially that a person's post-revocation reincarceration was a "sanction" distinct from their original sentence, and thus they were ineligible for good time or parole. *See Hargus*,

---

[3] It should be noted that in the 2018 version of West Virginia Code § 15A-4-17(a) there was an exception to the general application of good time for those committed pursuant to West Virginia Code § 25-4-1 (1999), but that statute is not implicated here.

19

232 W. Va. at 741, 753 S.E.2d at 899; *Phalen*, 245 W. Va. at 316–17, 858 S.E.2d at 941–42. Indeed, the *Phalen* Court overtly recognized how neatly the *Hargus* petitioners' and the DOCR's arguments dovetailed. *Phalen*, 245 W. Va. at 316, 858 S.E.2d at 941. The Petitioners' argument here has an intuitive appeal, essentially positing that since *Hargus* all but foreclosed the logic and reasoning behind the DOCR's argument in *Phalen*, the legal right must have already been "clearly established." Indeed, a review of *Hargus* makes the outcome of *Phalen* quite predictable. If one were to forecast the outcome of *Phalen*, the prudent prognosticator would have predicted the decision going against the DOCR.

Despite *Hargus'* influence upon *Phalen's* outcome, qualified immunity does not require the public official to have a strong argument; all that is required to receive immunity is that the right was not "clearly established" or reasonably known by the official. *See Hutchison*, 198 W. Va. at 148, 479 S.E.2d at 658 (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *A.B.*, 234 W. Va. at 507, 766 S.E.2d at 766. Crucially, *Hargus* and *Phalen* were addressing different issues, despite the same underlying logic controlling the outcome of both cases. *Hargus* only adjudicated the constitutionality of post-revocation reincarceration, while *Phalen* addressed whether a person was eligible for good time and parole for their post-revocation reincarceration. *Hargus'* logic was plainly influential in deciding *Phalen*, but qualified immunity's standard is "clearly established," not probable, or

20

likely to be established. Although *Phalen* was plainly the next logical step after *Hargus*, the SCAWV had not yet taken that step until the decision in *Phalen*.

Indeed, despite the *Phalen* majority not finding the DOCR's argument persuasive, the DOCR was not without its own textual and logical support. As the *Phalen* dissent points out, West Virginia Code § 62-12-26 states that supervised release is only to begin upon the "expiration" of one's sentence or parole, suggesting that the underlying sentence had ended, making supervised release distinct from the sentence. *Phalen*, 245 W. Va. at 323, 858 S.E.2d at 948 (Armstead, J., dissenting). *See* W. Va. Code § 62-12-26(a) (2021). The dissent also points out that § 62-12-26 grants the court the discretion to modify, terminate, or revoke one's supervised release, powers the court is typically given over a parole term rather than a sentence. *Phalen*, 245 W. Va. at 324, 858 S.E.2d at 948 (Armstead, J., dissenting). In light of the contextual differences between *Hargus* and *Phalen* and the colorable arguments put forth in the *Phalen* dissent, we cannot say that the application of parole and good time to those reincarcerated after the revocation of their supervised release under § 62-12-26 was clearly established before the *Phalen* decision. Therefore, Respondent Jividen is entitled to qualified immunity protection from liability for claims arising out of her signing the warrants that led to the rearrest and reincarceration of the Petitioners.

21

Because we hold that the Respondents have absolute and qualified immunity from all claims arising out of their acts in this case, we need not reach any of the Petitioners' other claims, including *respondeat superior*, SB 713's statutory immunity provisions and their constitutional validity, declaratory judgment, Respondent Morrisey's sovereign immunity and alleged involvement in the crafting and execution of the new DOCR good time policy, and the Respondents' personhood under 42 U.S.C. § 1983. It should be noted that nothing in this decision should be taken to challenge or disturb *Phalen*. That case is the natural progeny of *Hargus'* reasoning, and since *Phalen* the applicability of good time and parole to a person's post-revocation reincarceration has been clearly established. All we are deciding here is that before *Phalen*, the Respondents' conduct did not fit into that narrow bandwidth of conduct a public official can be held liable for under our immunity doctrine.

## IV. CONCLUSION

For the foregoing reasons, the circuit court's September 14, 2022, dismissal orders are affirmed.

Affirmed.

22